VINCENT INDUSTRIAL PLASTICS,
INC., Petitioner,

v.

NATIONAL LABOR RELATIONS
BOARD, Respondent.

No. 99–1202.

United States Court of Appeals,
District of Columbia Circuit.

Argued Feb. 23, 2000.

Decided April 14, 2000.

Ronald I. Tisch argued the cause for petitioner. With him on the briefs were Paul J. Kennedy and Alan D. Cohn.

Anne Marie Lofaso, Attorney, National Labor Relations Board, argued the cause for respondent. With her on the brief were Leonard R. Page, General Counsel, Linda R. Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and David Habenstreit, Supervisory Attorney.

Before: EDWARDS, Chief Judge, TATEL and GARLAND, Circuit Judges.

Opinion for the Court filed by Chief Judge EDWARDS.

EDWARDS, Chief Judge:

Vincent Industrial Plastics, Inc. ("Vincent" or "the Company") operates a plastics manufacturing plant in Henderson, Kentucky. On February 19, 1993, a majority of Vincent's full- and part-time production and maintenance employees (designated a bargaining unit by the National Labor Relations Board ("the Board")) selected the International Chemical Workers Union, AFL–CIO, Local 1032 ("the Union") as the employees' bargaining representative. The Board certified the Union on September 29, 1993, and Company and Union officials commenced collective bargaining negotiations in January 1994. The negotiations continued for more than a year, but the parties were unable to reach a final agreement. On February 16, 1995, after receiving a decertification petition from unit employees, the Company withdrew its recognition of the Union and declined to participate in any further collective bargaining negotiations. Between July 5, 1994 and April 20, 1995, the Union filed several unfair labor practice charges ("ULPs") alleging that Vincent violated the National Labor Relations Act ("the Act"), 29 U.S.C. § 158(a)(1), (3), (5) ("§ 8"), by unilaterally implementing material changes in working conditions, coercively interrogating an employee, disciplining and terminating employees on account of their support for the Union, and unlawfully withdrawing its recognition of the Union. The Board issued complaints on all of the charges.

Following a hearing on the complaints, an Administrative Law Judge ("ALJ") concluded that the Company was guilty of ULPs on all but one charge. See Vincent Indus. Plastics, Inc., 328 N.L.R.B. No. 40, 1999 WL 282397, at *9 (1999). The National Labor Relations Board ("Board") subsequently held that Vincent was guilty of ULPs on all charges. The Board specifically rejected the ALJ's finding that Vincent had not violated the Act in unilaterally changing the Company's attendance policy. See id. at *1. The Board found

that the attendance policy was a material working condition, and that Vincent was not legally justified in changing the policy without the Union's agreement. The Board issued a cease-and-desist order (including a remedy of reinstatement and back pay for the employees who were unlawfully fired) and a *"Gissel"* bargaining order, *see NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), requiring the Company to recognize the Union and to resume collective bargaining negotiations.

Vincent petitions for review of the Board's order, and the Board cross-petitions for enforcement. We grant the Board's petition for enforcement, with one significant exception. The Board, inexplicably, has once again defied the law of this circuit and failed to offer an adequate justification for the bargaining order sanction imposed against Vincent. We therefore find ourselves in the all-too-familiar position of having to remand this case to the Board for adequate justification of the proposed affirmative bargaining order, thus further delaying relief for the employees the Board purports to protect.

## I. BACKGROUND

### A. Factual Background

The facts of this case are laid out in detail in the ALJ's decision, so we need only summarize here. The Company's conduct that was found to be unlawful by the Board began during the last half of 1994, after Vincent and the Union had been negotiating for five months. Between July and December, 1994, Vincent unilaterally promulgated four policy changes relating to attendance, work duties, working hours, and time-keeping. We review each of these briefly.

On July 1, 1994, Vincent changed the policy by which it disciplined employees for attendance problems. Prior to that time, Vincent used a bifurcated system to tally employees' excess attendance "occurrences" (unexcused absences, tardiness, and early exits). For pre-August 1992 hires, occurrences cleared from an employee's personnel file at the end of every fiscal year. For employees hired after August 1992, occurrences cleared on a rolling 360–day basis. All employees were subject to discipline if they incurred a certain number of attendance occurrences during the applicable period.

Vincent believed that, among pre-August 1992 hires, the end of each fiscal year occasioned a rash of attendance occurrences as employees took advantage of the impending slate-cleaning to maximize their attendance occurrences for the year. Vincent proposed that pre-August 1992 hires operate under the rolling system. The Union stated that it wanted to negotiate the entire contract rather than agree to provisions piecemeal. In the face of the Union's insistence on negotiating the entire agreement prior to agreeing to a revised attendance policy, the Company unilaterally imposed its policy change on July 1, 1994, at the beginning of the new fiscal year.

Between October and December 1994, Vincent instituted three additional policy changes without first proposing them to the Union during ongoing collective bargaining sessions. First, in October, Vincent relieved quality control employees of their weighing and labeling duties, which comprised 25% of their workday, and transferred the duties to press operators. Then, in mid-November, Vincent instituted a shift extension requiring quality control employees to work an extra 15 minutes at the end of each shift. Finally, on December 9, 1994, Vincent eliminated the use of time cards and instituted a team system in which employees check in at the beginning of their shift with their "team leader," and the team leader then keeps track of the hours worked by each team member. Vincent alleged that the new system was precipitated by its observation that time cards were often lost or stolen, that employees clocked in without reporting immediately to work, and that employees clocked in for one another.

In addition to the foregoing changes in working conditions, the Union also filed ULP charges related to Vincent's treatment of four Union members. First, in December 1994, Mark Coomes, a supervisor, called Robert Ferguson away from his machine and asked him whether he had heard anything about the Union going on strike. This inquiry was apparently prompted by an earlier conversation that day between Mr. Coomes and Michael Early, president of the Union, in which Mr. Early raised the possibility of a strike vote. In response to Mr. Coomes' questioning, Mr. Ferguson responded that he did not know anything about a possible strike. Mr. Ferguson testified that Mr. Coomes inquired as to a possible strike a second time that day, in the break room. The Union alleged that Mr. Coomes' conduct constituted coercive interrogation in violation of the Act.

In January 1995, Vincent disciplined Gloria Chester, the Union's designated observer at the 1993 election and its plant steward until October 1993, for alleged insubordination and disrespectful actions toward a supervisor. On the day when she was disciplined, Ms. Chester, while returning to her press after bringing some material to the quality control office, stopped to speak with Sue Scott, another press operator. During the conversation, Ms. Scott complained to Ms. Chester about a clean-up job that Supervisor Rebecca Basham had assigned to Ms. Scott. Ms. Chester said, "I would tell Becky to kiss my ass." At this time, Ms. Basham was standing behind Ms. Chester and overheard the remark. Ms. Chester, apparently unaware of Ms. Basham's presence, returned to her press area. Later that day, Tina Bradford, Vincent's personnel manager, issued Ms. Chester a written warning. The Union claimed that Vincent disciplined Ms. Chester on account of her Union affiliation.

The third ULP related to Vincent's treatment of Union members involves the allegedly discriminatory termination of Mr. Early, Union President, in February 1995. Mr. Early was arrested in September 1994 for driving while intoxicated. He was to be sentenced either to 32 days jail time or to five months of jail time in coordination with a work release program with his employer. In February 1995, Mr. Early approached John Domsic, plant manager, and requested that Vincent participate in the work release program. On February 7, Mr. Domsic informed Mr. Early that Vincent would not participate in the work release program. Mr. Early then inquired abut the possibility of taking personal leave, and Mr. Domsic replied that he would get back to Mr. Early.

On February 13, Mr. Early was sentenced to 32 days in jail and 28 days in a rehabilitation center, to begin February 17. On February 14, Mr. Early called Ms. Bradford, informed her that he would be starting a jail sentence and therefore would not be able to report to work, and asked about COBRA benefits. When Ms. Bradford said she was not aware that he had been terminated, he replied that he felt that the Company's refusal to participate in the work release program was tantamount to termination. When Mr. Early failed to report to work on February 15, he was effectively terminated.

The day Mr. Early was terminated, employees circulated a petition to decertify the Union. Over two days, on February 15 and 16, 1995, a majority (82 out of 128) of the maintenance and production employees signed the petition. Management at Vincent verified the signatures and informed the Union that the Company would no longer engage in bargaining. After withdrawing its recognition of the Union, Vincent granted wage increases, implemented a 401(k) plan, and denied the Union's request for information regarding bargaining unit employees.

About a month later, on March 20, Vincent terminated Wanda Nantz, a press operator and Union supporter (she was, in fact, among those who did not sign the petition to decertify the Union). Vincent alleges that it fired Ms. Nantz because she failed, for the first two hours of her March

20 shift, to record hourly "shot" counts (*i.e.*, the number of parts produced for that hour) in the machine's production log. After the omission was brought to Ms. Nantz's attention, she recorded the counts until she was relieved of her duties and given a disciplinary notice. The discipline would not have resulted in Ms. Nantz's discharge except that she earlier had been suspended for three days for smoking near her press.

## B. Board Proceedings

The ALJ found that Vincent violated the Act by unilaterally implementing all of the policy changes except for the attendance policy. The ALJ termed the attendance problem "sufficiently urgent to warrant unilateral implementation" of the employer's policy. *Vincent Indus.*, 1999 WL 282397 at *9. According to the ALJ, the Union had the opportunity to bargain but chose to insist on an overall agreement. *See id.* As for the other policy changes, the ALJ found both that, in each case, Vincent failed to present the proposed changes to the Union during contract negotiations, thereby giving the Union no opportunity to bargain over the issues, and that none of the changes was necessitated by economic hardship. *See id.* at *8, *10.

In addition, the ALJ found the questioning of Mr. Ferguson, the termination of Mr. Early and Ms. Nantz, and the disciplining of Ms. Chester to constitute violations of § 8(a)(1) and (3) of the Act. The interrogation of Mr. Ferguson, according to the ALJ, interfered with Mr. Ferguson's right "to keep private his sentiments as to the Union and his knowledge of its affairs." *Id.* at *10. The ALJ found that Gloria Chester's discipline was motivated by her Union affiliation, given the "ample credible evidence" that the language she used generally was tolerated at Vincent, that no documentation supported Vincent's assertions that other employees had been disciplined for similar behavior, and that no management representative ever questioned Ms. Chester about the reason she left her press area, which was ostensibly the reason she was disciplined. *Id.* at *11–

12. The ALJ termed Vincent's explanation for why it refused to accommodate Mr. Early's work release or leave request "inartful pretext," and found that, but for Mr. Early's Union affiliation, Vincent would not have both declined to participate in the work release program and denied him personal leave. *See id.* at *13. With respect to Ms. Nantz, the ALJ found that, during the five-month period that the requirement of an hourly "shot" count had been in effect, no one was cited for omissions from the production log although omissions did occur. *See id.* at *15. The ALJ accordingly concluded that, given Ms. Nantz's public pro-Union stance, the issuance of the citation to Ms. Nantz followed by her discharge was discriminatory and a violation of § 8(a)(1) and (3) of the Act.

On review of the ALJ's decision, the Board affirmed all of the ALJ's ULP findings save one. The Board reversed the ALJ on the attendance policy issue, finding that Vincent had "failed to prove that its attendance problem constituted an economic exigency." *Id.* at *2. Therefore, the Board found that the change in attendance policy violated § 8(a)(1) and (5) of the Act.

On its own analysis, the Board found that Vincent's withdrawal of recognition was a violation of § 8(a)(1) and (5) of the Act, applying the so-called "*Master Slack*" factors, *see Master Slack Corp.,* 271 N.L.R.B. 78 (1984), to evaluate the causal connection between the unremedied ULPs and subsequent employee expression of dissatisfaction with a union. The Board cited the following factors in finding a causal connection between the ULPs and the decertification movement: (1) the unremedied ULPs continued until the day before the employees began signing the decertification petition; (2) the unilateral changes and disciplining of Union supporters were "likely to have a long lasting effect on the bargaining unit and to discourage employees from supporting the Union"; and (3) the disciplining and termination of Union supporters "convey to em-

ployees the notion that any support for the Union may jeopardize their employment." *Vincent Indus.*, 1999 WL 282397, at *3. The Board also imposed an affirmative bargaining order as a remedy for the Company's violations of the Act. No justification was offered to support the bargaining order.

Vincent petitions for review of all of the above findings. In addition, Vincent argues that the Board has failed to adequately justify imposing an affirmative bargaining order as a remedy for the violations of the Act. The Board cross-petitions for enforcement of its order.

## II. ANALYSIS

 Under the Act,

[i]t shall be an unfair labor practice for an employer—

> (1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 157 of this title; . . .
>
> (3) by discrimination in regard to hire or tenure of employment or any term or condition of employment to encourage or discourage membership in any labor organization . . .
>
> (5) to refuse to bargain collectively with the representatives of his employees, subject to the provisions of section 159(a) of this title.

29 U.S.C. § 158(a). We review Board ULP findings under a deferential standard. This court will uphold the Board's decision upon substantial evidence even if we would reach a different result upon *de novo* review. *See Perdue Farms, Inc., Cookin' Good Div. v. NLRB*, 144 F.3d 830, 834–35 (D.C.Cir.1998). We are even more deferential when reviewing the Board's conclusions regarding discriminatory motive, because most evidence of motive is circumstantial. *See LCF, Inc. v. NLRB*, 129 F.3d 1276, 1281 (D.C.Cir.1997).

 Furthermore, when the Board, as it did here, concludes that unremedied ULPs tainted a decertification petition, this court requires it to offer a reasoned explanation, based on substantial evidence,

in support of its finding. *See Quazite Div. v. NLRB*, 87 F.3d 493, 496–97 (D.C.Cir. 1996). Finally, to justify the imposition of an affirmative bargaining order, we require the Board to explicitly balance three considerations: (1) the employees' § 7 rights; (2) whether other purposes of the Act override the rights of employees to choose their bargaining representatives; and (3) whether alternative remedies are adequate to remedy the violations of the Act. *See Skyline Distribs. v. NLRB*, 99 F.3d 403, 410 (D.C.Cir.1996).

### A. The Board's ULP Findings

 The Board's holding that Vincent's unilateral actions changing established working conditions constituted ULPs is easily upheld. An employer may not unilaterally impose material changes in terms or conditions of employment that are mandatory subjects of bargaining without first negotiating to impasse. *See Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 198, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991); *Grondorf, Field, Black & Co. v. NLRB*, 107 F.3d 882, 886 (D.C.Cir.1997). There are two exceptions to this general rule: An employer may impose unilateral terms if the union engages in dilatory tactics to delay bargaining. *See Serramonte Oldsmobile, Inc. v. NLRB*, 86 F.3d 227, 235 (D.C.Cir.1996). And an employer may act unilaterally if faced with an economic exigency justifying the change. *See Visiting Nurse Services, Inc. v. NLRB*, 177 F.3d 52, 56 (1st Cir.1999), *cert. denied*, —— U.S. ——, 120 S.Ct. 787, 145 L.Ed.2d 664 (2000); *RBE Elecs. of S.D., Inc.*, 320 N.L.R.B. 80, 81 (1995). An economic exigency must be a "heavy burden" and must require prompt implementation. *See RBE Elecs.*, 320 N.L.R.B. at 81. The employer must additionally demonstrate that "the exigency was caused by external events, was beyond the employer's control, or was not reasonably foreseeable." *Id.* at 82 (footnote omitted).

 Vincent imposed all of the changes save one without presenting a proposal to

the Union during bargaining sessions. Vincent can mount no argument that any of the disputed changes were made due to an economic exigency, although it tries to argue that the changes were not material or that they were waived by the Union. These arguments hold no water: All of the changes involved mandatory subjects of bargaining, they raised material issues, and the Union cannot be held to have waived the right to bargain over an issue that was never proposed during bargaining sessions. There is one change that Vincent did propose before imposing: the change in attendance policy. Vincent urges that the Board's decision on the attendance policy issue should be reversed, first, because the Union waived its right to bargain over this issue, and, second, because the Company had to make the changes in order to meet an economic exigency. Vincent's arguments are meritless.

■ There was no waiver by the Union here. The Union desired to bargain over the attendance policy; it made clear to Vincent that it wanted to negotiate the entire contract, including the attendance policy, as a whole. *See Visiting Nurse Servs.*, 177 F.3d at 59 (rejecting employer's suggestion that a union cannot insist on negotiating an entire contract rather than piecemeal negotiation). In addition, the Union offered counter-proposals to the Company's attendance policy prior to Vincent's imposition of the policy change. *See* Eighth Negotiation Session Meeting Notes, May 18, 1994, at 3–5, *reprinted in* Joint Appendix ("J.A.") 795–97; Ninth Negotiation Session Meeting Notes, May 24, 1994, at 3–4, *reprinted in* J.A. 802–03. The Union did not precipitate an impasse by insisting on negotiating a contract as a whole rather than piecemeal. Such a view is mischievous, because it would both "permit the employer to remove, one by one, issues from the table and impair the ability to reach an overall agreement through compromise on particular items" and "undercut the role of the Union as the collective bargaining representative." *Visiting Nurse Servs.*, 177 F.3d at 59.

■ Nor did the Board err in finding a lack of evidence to support Vincent's claim of economic necessity. The Board correctly noted that the "exigency" asserted by Vincent was hardly extraordinary: The Company could point only to the impending possibility of attendance problems. The Board reasonably found that the Company's alleged problem did not pose a "heavy burden" necessary to show an economic exigency. *See RBE Elecs.*, 320 N.L.R.B. at 81. In addition, the Board reasonably concluded that Vincent failed to show that the attendance problem was unforeseen, caused by external events outside its control, or that it was new. *See id.* at 82.

■ The Board's findings that Vincent fired two employees and disciplined another in violation of the Act are also supported by substantial evidence in the record. To establish a causal nexus between adverse employment decisions and an employee's union affiliation, the complaining party must first show that protected activity "was a 'motivating factor'" in the adverse employment decision, and then the employer may show that it would have made the adverse decision even had the employee not engaged in protected activity. *Wright Line, Inc. v. Lamoureux*, 251 N.L.R.B. 1083, 1089 (1980); *see also NLRB v. Transportation Management Corp.*, 462 U.S. 393, 403, 103 S.Ct. 2469, 76 L.Ed.2d 667 (1983) (approving of *Wright Line* approach). To establish an employer's discriminatory motive, the NLRB may "consider[ ] such factors as the employer's knowledge of the employee's union activities, the employer's hostility toward the union, and the timing of the employer's action." *Power Inc. v. NLRB*, 40 F.3d 409, 418 (D.C.Cir.1994). Evidence that an employer has violated § 8(a)(1) of the Act can support an inference of anti-union animus. *See Parsippany Hotel Management Co. v. NLRB*, 99 F.3d 413, 423–24 (D.C.Cir.1996).

The ALJ found, and the Board affirmed, that Vincent violated the Act in three in-

stances when it took adverse employment actions against its employees on account of their Union affiliation: (1) when Vincent disciplined Gloria Chester; (2) when Vincent terminated Michael Early; and (3) when Vincent terminated Wanda Nantz. With respect to all three findings, there is substantial evidence to support the Board's determination.

 The ALJ, with whom the Board agreed, relied on Ms. Chester's position as a Union supporter, the fact that she received discipline at a time when Vincent had taken several unlawful unilateral actions, and the "significant aberrant circumstances surrounding issuance of the warning" to conclude that the discipline would not have occurred but for Ms. Chester's Union involvement. *Vincent Indus.*, 1999 WL 282397, at *11. There is substantial evidence to support this conclusion, especially given our deference to the Board's findings regarding discriminatory motive. *See Laro Maintenance Corp. v. NLRB*, 56 F.3d 224, 229 (D.C.Cir.1995). Vincent cites to testimony in which the employer asserted that other employees had been disciplined for similar behavior, but the ALJ and Board rejected this testimony for lack of documentary or other corroborating evidence. The Board's judgment on this point was reasonable. *Cf. Synergy Gas Corp. v. NLRB*, 19 F.3d 649, 653 (D.C.Cir.1994) (reversing finding of discrimination where company introduced personnel records to demonstrate that other employees had been terminated for actions similar to that of the complaining employee).

 The ALJ and the Board relied on similar factors to conclude that the Company discharged Mr. Early in violation of the Act. First, the ALJ found that a *prima facie* case of discrimination was established in light of the other unlawful conduct engaged in by Vincent and the Company's response to Mr. Early's request for accommodation. *See Vincent Indus.*, 1999 WL 282397, at *13. The ALJ found Vincent's explanation for refusing to participate in the work release program to

be "cryptic" and nothing "other than inartful pretext." *Id.* (noting that Mr. Domsic stated both that Vincent did not want to take responsibility for Mr. Early's program and that Vincent did not know what it would have been required to do). The Board agreed and we cannot second-guess that judgment. In upholding the Board on this point, we do not suggest that all employers must grant all requests similar to Mr. Early's lest they be accused of discriminating against bargaining unit employees. A company that consistently applies neutral policies, for example, usually is on safe ground. *See TIC–The Indus. Co. Southeast, Inc. v. NLRB*, 126 F.3d 334, 338 (D.C.Cir.1997). In this case, there is no evidence that the Company had any policy at all to apply to Mr. Early. Therefore, it cannot be said that the ALJ was unreasonable in finding that Mr. Early's status as Union President influenced Vincent's decision to refuse to accommodate his particular needs as a result of his arrest, especially considering the ALJ's conclusion, supported by substantial evidence, that Mr. Early "was a long-term skilled press operator and that there is not a scintilla of evidence that alcohol ever affected his job performance or that he posed any threat to others at the plant." *Vincent Indus.*, 1999 WL 282397, at *13.

 Vincent argues that the ALJ erroneously found violations of the Act for the discharge of Ms. Nantz on two grounds: (1) the ALJ erroneously concluded that Vincent knew of Ms. Nantz's Union affiliation; and (2) the discipline meted out to Ms. Nantz was consistent with Vincent's past practice. The first challenge is easily dismissed. Ms. Nantz had been a pro-Union advocate during the election, the shop steward, and the Treasurer of the Local, and she had refused to sign the decertification petition. Under these circumstances, there was substantial evidence for the ALJ to conclude that Vincent was aware of Ms. Nantz's affiliation with the Union.

With respect to Vincent's justification for disciplining Ms. Nantz, the ALJ found that, for the five months that the hourly "shot count" requirement was in place, there was no evidence that any employees were disciplined even though employees other than Ms. Nantz had made mistakes. Vincent proffered evidence that prior to the institution of the new policy, employees were warned for failure to fill out production logs correctly; but there are no such warnings in evidence (apart from Ms. Nantz's discharge) for the period during which the new policy was in place. Under these circumstances, there was substantial evidence for the ALJ and Board to conclude that Vincent's purported reason for disciplining Ms. Nantz was pretextual.

The Board's finding that Vincent supervisor Mark Coomes violated the Act by coercively interrogating Robert Ferguson is less easily upheld. The interrogation of employees by an employer is evaluated under a five-factor totality of the circumstances test in order to determine whether the questioning is coercive and therefore violates § 8(a)(1). These factors are: (1) the history of the employer's hostility and discrimination against unions; (2) whether the information sought is of a type that could be used to take action against individual employees; (3) the rank of the questioner; (4) where the questioning occurred; and (5) the truthfulness of the reply. *See Perdue Farms, Inc.,* 144 F.3d at 835. Here the ALJ relied on the following facts to conclude that Mr. Coomes compromised Mr. Ferguson's right to "keep private his sentiments as to the Union and his knowledge of its affairs": Mr. Coomes pulled Mr. Ferguson away from his work area to initiate questioning; and Mr. Ferguson had not previously identified with the Union. *Vincent Indus.,* 1999 WL 282397, at *10. The ALJ inferred that Mr. Coomes' purpose, to test the strength of the Union, was clear. Given the substantial evidence in the record, we cannot say that this conclusion is unreasonable.

Vincent relies on *Certainteed Corp.,* 282 N.L.R.B. 1101 (1987), for the proposition that there is nothing coercive about an employer inquiring about the possibility of a strike. In *Certainteed,* the ALJ found that the employer did not violate the Act by asking an employee about the possibility of a strike, because the employer had a reasonable basis to fear an "imminent strike" and had an interest in determining whether it would be able to keep its business open. 282 N.L.R.B. at 1107. Here, while Mr. Coomes had just heard from Mr. Early about the possibility of a strike vote, Mr. Coomes had no legitimate reason for inquiring of Mr. Ferguson; Mr. Early's offhand comment about the possibility of a strike vote sometime in the future could hardly be relied upon to support a reasonable basis to fear an "imminent strike." *Certainteed* does not compel reversal of the Board.

The Board's findings that several unremedied ULPs tainted the decertification petition is unassailable. For the first year after a successful certification election, a union enjoys an irrebuttable presumption of majority support, after which the employer may withdraw recognition if it has a good faith, reasonable basis to doubt majority support for the union. *See Peoples Gas Sys., Inc. v. NLRB,* 629 F.2d 35, 37–38 (D.C.Cir.1980). When a majority of unit employees signs a petition in support of decertification, an employer may reasonably doubt that there exists majority support for the union. *See Sullivan Indus. v. NLRB,* 957 F.2d 890, 898 (D.C.Cir.1992). Nonetheless, if the Board determines that unremedied ULPs contributed to the erosion of support for the union, the employer may commit an unfair labor practice by withdrawing its recognition of the union. *See, e.g., Lee Lumber & Bldg. Material Corp. v. NLRB,* 117 F.3d 1454, 1458–60 (D.C.Cir.1997) (per curiam) (examining whether ULPs contributed to lack of support for union).

The Board's traditional four-factor test for determining whether there is a causal

connection between unremedied ULPs and a petition for decertification consists of the following elements: "(1) [t]he length of time between the unfair labor practices and the withdrawal of recognition; (2) the nature of the illegal acts, including the possibility of their detrimental or lasting effect on employees; (3) any possible tendency to cause employee disaffection from the union; and (4) the effect of the unlawful conduct on employee morale, organizational activities, and membership · in the union." *Master Slack Corp.*, 271 N.L.R.B. at 84. Vincent argues that the explanation offered by the Board does not satisfy the *Master Slack* requirements. We reject this contention.

The Board adequately explained its decision on the basis of all four *Master Slack* factors, in more than conclusory language. The Board noted the close temporal link between the unremedied ULPs and the decertification petition. *See Vincent Indus.*, 1999 WL 282397, at *3. The Board additionally explained that the unilateral implementation of changes in working conditions has the tendency to undermine confidence in the employees' chosen collective-bargaining agent. *See id.* The Board finally reasonably concluded that the discipline and termination of public supporters of the Union "convey to employees the notion that any support for the Union may jeopardize their employment." *Id.* The Board's conclusion that Vincent's practices contributed to the decertification petition are reasonably justified and supported by substantial evidence. *See NLRB v. Williams Enters., Inc.*, 50 F.3d 1280, 1288–89 (4th Cir.1995) (upholding finding of causation where four months passed between company's anti-union statements and decertification petition); *Columbia Portland Cement Co.*, 303 N.L.R.B. 880, 882 (1991), *enf'd*, 979 F.2d 460, 464–65 (6th Cir.1992) (upholding Board's finding of causation where justification offered by Board was simply that the unremedied ULPs "are likely to have undermined the Union's authority generally and influenced [the Union's] employees to reject the Union as their bargaining representative")

(internal quotation marks omitted) (alteration in original).

## B. The Board's Remedies

The Board's remedies on behalf of the Union and the unit employees who were adversely affected by Vincent's ULPs included a cease-and-desist order, reinstatement and back pay for the employees who were unlawfully terminated, and an affirmative bargaining order. The Company challenges all of the remedies imposed by the Board on the grounds that the employer did not commit any ULPs. As noted above, we reject this contention as meritless. The Company argues further, however, that even if the Board did not err in finding the aforecited ULPs, there was no basis for the Board to issue an affirmative bargaining order against Vincent. The Company's argument on this point is well taken.

The Board approved the ALJ's recommended remedy of an affirmative bargaining order with little explanation. The closest the ALJ came to justifying the order was to observe that the "serious and egregious misconduct shown here[ ] demonstrates a general disregard for fundamental rights guaranteed employees by Section 7 of the Act." *Vincent Indus.*, 1999 WL 282397, at *15. This will not do. This court repeatedly has reminded the Board that an affirmative bargaining order is an extreme remedy that must be justified by a reasoned analysis that includes an explicit balancing of three considerations: (1) the employees' § 7 rights; (2) whether other purposes of the Act override the rights of employees to choose their bargaining representatives; and (3) whether alternative remedies are adequate to remedy the violations of the Act. *See Skyline Distribs.*, 99 F.3d at 410. There is no such reasoned analysis in the instant case.

Instead, the Board's counsel was forced to conjure up an argument in an effort to bolster the Board's unsupported position. According to counsel, the Board

need not justify the imposition of a bargaining order in two types of cases: where the employer has unlawfully withdrawn recognition from the Union; and, as a subset of the first class, where there are explicit *Master Slack* findings demonstrating a causal connection between unremedied ULPs and a withdrawal of recognition. *See* Br. for NLRB at 47–55. Counsel's argument in defense of this position was inspired and thoughtful, albeit in vain. The problem here is that counsel's argument is nowhere to be found in the orders under review, so we cannot ascribe it to the Board. The argument therefore constitutes a *post hoc* rationalization, which carries no weight on review. *See International Union of Petroleum & Indus. Workers v. NLRB*, 980 F.2d 774, 781 (D.C.Cir.1992).

 The Board's stubborn refusal to accept this circuit's position on affirmative bargaining orders is perplexing, for it merely undermines the Board's purported goal of protecting workers against employer violations of the Act. Board decisions, like those from other administrative agencies, are entitled to deference. However, once a court has issued a legal ruling on a disputed issue, the Board is bound to follow the court's judgment unless and until it is reversed by the Supreme Court. The Board, no doubt, will plead innocence, claiming that circuit courts often take different positions on certain legal issues, so the Board is free to adopt a course most to its liking within a maze of disparate courts of appeals judgments. In addition, as counsel pointed out during oral argument in this case, the Board sometimes has no clear idea where a petition for review will be filed, so it cannot always guess right in deciding what circuit law to follow. This latter point is a fair rebuttal, but it is shortsighted in a case such as the instant one. What is so troubling about this case, and others like it, is that the Board could easily follow the law of the D.C. Circuit— *i.e.,* give a reasoned analysis to support an affirmative bargaining order—without ever transgressing the law of any other circuit. Some other circuits may not require as much as does the D.C. Circuit with respect to what is required to justify an affirmative bargaining order, but no circuit will reject a bargaining order if the Board justifies it as this court requires.

What is ultimately dissatisfying about this familiar dance is not a sense that this court's institutional integrity is undermined by the Board's refusal to modify its behavior in response to operant conditioning, but that those left in the lurch are precisely those who, in this case, sought protection from the Board. As a result of the Board's failure to justify the imposition of an affirmative bargaining order, relief for the employees represented by the Union will be that much further delayed. Three years passed between the ALJ's decision and the Board's decision upholding the ALJ. Another year has passed since the issuance of the Board decision here on review. We now remand to the Board for an undetermined amount of time. As the Board well knows, in the context of employee representation and collective bargaining, relief delayed under the Act may be relief denied. This makes little sense where, as here, the Board can easily satisfy the commands of this circuit's law without running amok because of a split in the law of the circuits.

The Board may persist in its stubbornness, but that will not dissuade this court from fulfilling its role on behalf of parties seeking judicial review. As we have said before when remanding to the Board to justify an affirmative bargaining order, "[w]e persist not out of pique but from a sense that it is our duty to ensure that the Board adheres to its statutory mandate." *Caterair Int'l v. NLRB*, 22 F.3d 1114, 1123 (D.C.Cir.1994).

## III. CONCLUSION

For the reasons articulated herein, we deny in part and grant in part the petition for review and we grant in part and deny in part the cross-application for enforcement. We remand the case to the Board with instructions to justify the imposition

of an affirmative bargaining order as required by the law of this circuit or, in the absence of such justification, to vacate that portion of the remedy.