Notice: This opinion is subject to formal revision before publication in the Federal Reporter or U.S.App.D.C. Reports. Users are requested to notify the Clerk of any formal errors in order that corrections may be made before the bound volumes go to press.

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

————

Argued January 16, 2003　　　　Decided March 14, 2003

No. 01-1442

MARION HOSPITAL CORPORATION, *D/B/A*
MARION MEMORIAL HOSPITAL,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

————

Petition for Review and Cross-Application
for Enforcement of an Order of the
National Labor Relations Board

————

*Don T. Carmody* argued the cause and filed the briefs for petitioner.

*David A. Seid*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Arthur F. Rosenfeld*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Sharon Block*, Supervisory Attorney.

————

Bills of costs must be filed within 14 days after entry of judgment. The court looks with disfavor upon motions to file bills of costs out of time.

Before: EDWARDS and SENTELLE, *Circuit Judges*, and WILLIAMS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* EDWARDS.

Opinion dissenting in part filed by *Senior Judge* WILLIAMS.

EDWARDS, *Circuit Judge*: Petitioner Marion Hospital Corporation ("MHC") seeks review of a decision by the National Labor Relations Board ("Board" or "NLRB"), holding that petitioner committed multiple unfair labor practices ("ULPs"). The Board found that MHC violated §§ 8(a)(5) and (1) of the National Labor Relations Act ("NLRA" or "Act"), 29 U.S.C. §§ 158(a)(5), (1), in refusing to bargain with the designated bargaining agent of its employees, Southern Illinois Laborers' District Council Local 508 ("Local 508" or "Union"), withdrawing recognition from the Union, and unilaterally changing conditions of employment. *See Marion Hosp. Corp. d/b/a Marion Memorial Hosp. and S. Illinois Laborers' Dist. Council Local 508, AFL-CIO*, 335 N.L.R.B. No. 80, 2001 WL 1126579, at \*7 (2001) ("*Marion Hospital*"). As a remedy for these violations, the Board issued an affirmative order to bargain.

MHC claims that the cited conduct was not illegal, because company officials had a good-faith reasonable doubt about the Union's majority status. MHC contends that, in finding the disputed ULPs, the Board misapplied the legal standard enunciated in *Allentown Mack Sales & Serv. v. NLRB*, 522 U.S. 359, 361, 367-68 (1998) (employer may withdraw recognition from an incumbent union based on "good-faith reasonable doubt" or "genuine, reasonable uncertainty" supported by "objective considerations"), and ignored substantial record evidence supporting the employer's defense. MHC also challenges the affirmative order to bargain, claiming that the Board engaged in only a "cursory recitation" of the considerations required by this court in *Vincent Indus. Plastics v. NLRB*, 209 F.3d 727 (D.C. Cir. 2000). The NLRB disputes each of petitioner's contentions and cross-petitions for enforcement of its orders.

We deny MHC's petition for review and grant the Board's cross-petition for enforcement. Substantial evidence supports the Board's finding that petitioner refused to bargain with the Union. MHC was aware of nothing occurring before the refusal to bargain to give rise to a reasonable, good-faith uncertainty over the Union's majority status. It is also undisputed that MHC did nothing to mitigate, rescind, or otherwise remedy its refusal to bargain. The employer remained firm in its unlawful refusal to bargain, which continued unabated for over a month through the time when MHC withdrew recognition from the Union. Because nothing happened to "cure" the initial unlawful refusal to bargain, the employer's subsequent withdrawal of recognition was unjustified. Therefore, the Board was fully warranted in issuing an order to bargain in this case.

## I. BACKGROUND

The facts of this case are fully recounted in the Board's decision, *see Marion Hospital*, 2001 WL 1126579, at *1-*2, *11-*13, so we merely summarize the most salient facts here. Since 1996, Marion Memorial Hospital has been owned and operated by MHC as a private health care facility in Southern Illinois. *Id.* at *11. Employees at Marion Memorial Hospital are organized into separate units for medical and administrative personnel. Even before petitioner acquired the hospital, all employees were represented by Local 508. *Id.* The record indicates that the Union and petitioner successfully negotiated a series of year-long collective bargaining agreements, the last of which expired in April of 1998. *Id.* The main issues presented in this case concern efforts by the parties to negotiate a successor contract.

The parties commenced negotiations over a new labor contract in May of 1998, but talks stalled on issues relating to wages, a pension plan, and a wage incentive program for medical transcriptionists. *Id.* After a round of additional meetings yielded no progress, the parties requested assistance from the Federal Mediation and Conciliation Service. On July 7, 1998, petitioner presented its best offer to the

4

Union. *Id.* Representatives from Local 508 took that proposal to the employees in the bargaining unit. On July 16, 1998, the employees voted to reject the employer's offer; the employees also voted in support of a strike authorization notice. The Union never called a strike, however, ultimately preferring instead to pursue bargaining.

Not all bargaining unit employees endorsed the strike authorization. Between late July and early August 1998, some employees who had demurred on the strike authorization notified MHC of their intent to change their status in the Union and become "financial core" members of Local 508. *Id.* at *5-*6, *17. And, on July 30, 1998, one hospital employee, Joy Woods, initiated an effort to decertify Local 508. *Id.* at *12.

The Union agreed to rescind the strike notice and continue contract talks with petitioner, which resumed on August 4, 1998. *Id.* Negotiations continued until August 20, 1998, when the Union presented a counter-proposal to MHC's offer regarding wages and pension benefits. *Id.* Petitioner requested additional time to review the counter-proposal and to calculate the costs. Petitioner agreed to reconvene bargaining on September 9, 1998, but that proved to be an idle promise.

On September 1, 1998, Laborers' International Union of North America, AFL-CIO ("International") – the parent organization of Local 508 – filed a petition with the Board to become the certified bargaining agent for employees at the hospital. *Id.* The Board agreed to a consolidated proceeding to consider the International's petition for certification with the pending decertification petition filed earlier by Woods. The hearing on both matters was scheduled for September 10, 1998, but the International withdrew its petition for certification on that date. The Board, however, allowed the affected parties to present evidence on the decertification petition. During the course of the proceeding, the parties agreed that the size of the bargaining unit at issue was about 160 workers. *Id.*

Meanwhile, the Union sent letters to MHC on September 10 and 11 requesting a resumption of bargaining. On September 11, 1998, MHC responded with a letter questioning whether the Local 508 was still authorized to negotiate on behalf of the unit employees. *Id.*; *see also* Letter from Leonard W. Sachs, Counsel, MHC, to Randall J. Mayhew, President, Local 508 (Sept. 11, 1998), *reprinted in* Joint Appendix ("J.A.") 256-58 ("MHC Letter"). MHC also requested from both Local 508 and the International copies of their constitutions, related by-laws, and procedures for certifying a new bargaining representative. MHC Letter at 2, J.A. 257. MHC's letter made it clear that bargaining would not resume until the Union sent the material requested and, then, only "if warranted." *Id.* The Union sent five additional letters in September 1998 requesting MHC to meet and bargain, all to no avail.

On October 20, 1998, employee Woods, whose decertification petition was still pending before the NLRB, presented petitions to MHC with the signatures of workers who were allegedly dissatisfied with the Union's representation. *Marion Hospital*, 2001 WL 1126579, at *12. Woods' cover letter accompanying the petitions stated that a majority of workers "no longer wished to be represented by the Union." *Id.* The petitions included a total of 82 dated signatures from various Hospital employees. Of these signatures, 69 were dated between July 22, 1998 and August 6, 1998, while seven were dated between October 15, 1998 and October 20, 1998. The remaining signatures were those of employees who were not members of the bargaining unit. *Id.* at *2.

On October 28, a hospital administrator told employees that MHC was withdrawing official recognition from the Union and that MHC would begin unilaterally implementing its proposed wage changes. *Id.* at *12-*13. Thereafter, petitioner unilaterally changed a number of conditions of employment at the hospital. *Id.*

Local 508 filed ULP charges against MHC, and the General Counsel for the NLRB issued a consolidated complaint on December 9, 1998. *Id.* at *10. An ALJ conducted an eviden-

tiary hearing and, on April 29, 1999, found that petitioner had violated §§ 8(a)(5) and (1) of the NLRA in (1) refusing to bargain on September 11, 1988, (2) withdrawing recognition from the Union on October 28, 1998, and (3) unilaterally implementing changes to the employees' terms and conditions of employment. *Id.* at *20.

With respect to the refusal to bargain, the ALJ found that MHC's letter of September 11, 1998 was undisputed evidence that petitioner had placed an unlawful condition on bargaining with Local 508. *Id.* The judge rejected petitioner's assertions that its refusal was permissible because of a good faith doubt about the Union's authority. The ALJ found that the Union's aborted strike activity, the International's withdrawn certification petition, the pending decertification petition, and the employees' change-of-membership letters gave petitioner no credible reasons to question Local 508's authority to bargain on behalf of the employees. *Id.* at *21-*22.

The ALJ reached a similar conclusion with respect to MHC's defense of its conduct in October of 1998. On this point, petitioner principally claimed that the employee anti-union petitions established good-faith uncertainty sufficient to justify MHC's withdrawal of recognition on October 28. *Id.* at *22-*23. The ALJ, however, discounted the petitions, because MHC did not receive the petitions or know of their contents until after unlawfully refusing to bargain with the Union on September 11, 1998. The ALJ thus found that the petitions were "tainted," so they could not support a withdrawal of recognition. *Id.*; *see also Lee Lumber & Bldg. Material Corp. v. NLRB,* 117 F.3d 1454 (D.C. Cir. 1997).

The Board, on a divided vote, agreed with the ALJ's ultimate conclusion that all of the employer's challenged actions violated the NLRA. First, the Board affirmed the ALJ's finding that the September 11 refusal to bargain was illegal and that petitioner had failed to offer any credible evidence calling into question the Union's majority status. *Marion Hospital,* 2001 WL 1126579, at *3-*4. Specifically, the Board noted that neither the International's certification petition nor Woods' decertification petition could overcome

the presumption that the Union enjoyed continued majority status. The Board also found that the actions of the employees who became financial core members "made clear their desire for continued representation by the Union." *Id.* at *4.

The Board likewise agreed with the ALJ that MHC committed an ULP when it withdrew recognition from the Union. However, the Board "disagree[d] with the [ALJ]'s finding that all the signatures on the antiunion petitions the [employer] received on October 20 were tainted by the [employer]'s September 11 unlawful refusal to bargain." *Id.* On this point, the Board found that "only employee signatures dated after September 11 are presumptively tainted by the unlawful refusal to bargain. No such presumption of unlawful taint attaches to those employee signatures dated before September 11." *Id.* The Board nonetheless held that, under the *Allentown Mack* standard, MHC had not established a reasonable, good-faith uncertainty about the Union's majority status:

> The record reveals that the bargaining unit consisted of 157 employees on October 28, when [MHC] withdrew recognition. As stated above, the petitions [MHC] received from employee Woods together with the letter appeared to contain the signatures of 82 employees. However, examination of those petitions reveals that of the 82 signatory employees, 7 were not unit employees on October 28 and 6 others signed the petition after [MHC]'s refusal to bargain beginning on September 11. In sum, the bargaining unit consisted of 157 employees, but only 69 employee signatures on the antiunion petitions can be counted, 10 short of a majority. Such a showing is insufficient to establish a good-faith reasonable uncertainty as to the Union's continuing majority status.
>
> Aside from the petitions, the record contains no other evidence that might establish uncertainty as to the Union's continuing majority status. Furthermore, even if the Respondent had presented addi-

tional evidence of employee disaffection arising at the time it received the antiunion petitions, the *Lee Lumber* presumption of unlawful taint would apply. Because the presumption has not been rebutted, any such evidence would not be probative of a good-faith reasonable uncertainty.

*Id.* at *5 (footnotes and citation omitted).

Finally, in light of the entire record, the Board found that an affirmative bargaining order was warranted to remedy MHC's unlawful refusals to bargain. *Id.* at *6-*7. After considering the facts of the case in light of the NLRA's overall goals, the Board found that an order to bargain was more appropriate than a less restrictive alternative.

This petition for review and the Board's cross-petition for enforcement followed.

## II. DISCUSSION

An employer who is charged with "refus[ing] to bargain collectively with representatives of his employees," 29 U.S.C. § 158(a)(5), may defend against the charge by proving that it possessed a good-faith reasonable doubt that the Union commanded majority support among unit employees. This exception to the duty to bargain only applies where an employer demonstrates a "genuine, reasonable uncertainty" about whether a union enjoys the continuing support of a majority of unit employees. *Allentown Mack*, 522 U.S. at 367. And any such uncertainty must focus on "objective considerations . . . supported by evidence external to the employer's own (subjective) impressions." *Pacific Bell v. NLRB*, 259 F.3d 719, 723 (D.C. Cir. 2001) (quoting *Allentown Mack*, 522 U.S. at 367-68 n.2 (emphasis omitted)). To mount this defense successfully, the employer must overcome the presumption that an incumbent union enjoys majority support. *Scepter, Inc. v. NLRB*, 280 F.3d 1053, 1056 (D.C. Cir. 2002).

An employer may not succeed with a "genuine, reasonable uncertainty" defense using evidence of employee disaffection arising after an unlawful refusal to bargain. The Board

presumes that any employee disaffection in such circumstances is unlawfully "tainted." *See Prime Servs., Inc. v. NLRB*, 266 F.3d 1233 (D.C. Cir. 2001). Therefore, a withdrawal of recognition following an unlawful refusal to bargain is illegal unless the employer can show that the preceding refusal to bargain was "cured":

> The presumption can be rebutted "only by an employer's showing that employee disaffection arose after the employer resumed its recognition of the union and bargained for a reasonable period of time without committing any additional unfair labor practices that would detrimentally affect the bargaining."

*Lee Lumber*, 117 F.3d at 1458 (citation omitted).

In the instant case, MHC has not rebutted this presumption. The Board's finding that MHC unlawfully refused to bargain on September 11 is fully supported by substantial evidence in the record. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951). The employer had no credible basis on or before that date upon which to rest a reasonable, good-faith uncertainty over the Union's majority status. Furthermore, MHC did nothing to mitigate, rescind, or otherwise remedy its refusal to bargain before subsequently withdrawing recognition. The record is thus clear that the unlawful refusal to bargain never abated before MHC withdrew recognition from the Union. Therefore, because nothing happened after September 11 to "cure" the unlawful refusal to bargain, the subsequent withdrawal of recognition was unlawful. It is true, as the Board found, that not all of the employee signatures on the antiunion petitions were "tainted," because some were given before the September 11 refusal to bargain. That fact is of no moment, however, because MHC was unaware of any such antiunion petitions when it refused to bargain on September 11. And the September 11 refusal to bargain was never cured.

In an effort to overcome this failing in its case, MHC argues that its demand for information on September 11, 1998 was not a refusal to bargain. Even if the demand was illegal, petitioner adds, its refusal to bargain was nonetheless justi-

fied in light of the certification and decertification petitions filed with the Board, the notifications from employees who had changed their status in the Union, and the Union's aborted strike activity. These arguments are specious. Therefore, the Board was fully justified in concluding that MHC's "asserted objective considerations [for refusing to bargain] as of September 11, either individually or in combination, do not establish reasonable uncertainty." *Marion Hospital*, 2001 WL 1126579, at *3.

In MHC's September 11 letter to the Union, the employer made it clear that it would not resume collective bargaining unless it gained access to the rules and procedures covering the Union and its parent organization. MHC Letter at 1-3, J.A. 256-58. The Union was under no obligation to comply with MHC's demand, because the employer had no right to obtain the Union files being sought. *See Pacific Bell*, 259 F.3d at 725. Therefore, the Board reasonably found that MHC's demand for this information as a condition of bargaining was an unlawful refusal to bargain.

MHC points to the circumstances surrounding the International's certification petition, as if to suggest that these events gave rise to good-faith uncertainty regarding the Union's majority status. The Board unsurprisingly rejected this argument out of hand, because the International's petition was no longer pending when MHC refused to bargain on September 11. The Board additionally held that the International's certification petition could not give rise to good-faith uncertainty, because the mere existence of a rival union's petition cannot itself call into doubt an incumbent union's majority status. *NLRB v. Maywood Plant of Grede Plastics*, 628 F.2d 1, 5 (D.C. Cir. 1980). For much the same reason, the Board properly rejected MHC's claim that the petition to decertify Local 508 was credible proof of good faith uncertainty:

> Allowing an employer to refuse to bargain in the face of either a decertification petition, a petition for representation, or both, would not give due weight to the incumbent union's presumption of continuing majority status, especially considering that either

> type of petition may be filed with only 30 percent of
> the unit employees' support.

*Marion Hospital*, 2001 WL 1126579, at *4 (citation omitted).

The other evidence on which MHC relies to justify its refusal to bargain on September 11 is similarly lacking in probative value. The Board found, and we agree, that the fact that Local 508 sought to continue bargaining instead of striking surely did not give the employer good reason to doubt the Union's majority status. The Union had a right to decide on the best course to protect the interests of unit employees in collective bargaining, and it could not be doubted for exercising a right *not to strike*. Likewise, there is no merit at all to MHC's assertion that employee resignation forms given to the Union gave rise to a good-faith uncertainty about the Union's majority status. Rather, as the Board found,

> the resignation forms of approximately 60 employees stating that they wished to remain financial-core members of the Union ... [demonstrated] their willingness to pay for the Union's representational services, even though they were not compelled to do so by a union-security clause ...[.] [T]hose employees made clear their desire for continued representation by the Union, even without the benefits of membership.

*Id.*

In sum, there is substantial evidence in the record supporting the Board's finding that MHC unlawfully refused to bargain with the Union beginning on September 11, 1998. The record is also clear that MHC did absolutely nothing to ameliorate the effects of the unlawful refusal to bargain, which continued unabated until the employer withdrew recognition from the Union in late October 1998.

MHC tries to press the argument that, whether or not the September 11 refusal to bargain was justified, the subsequent withdrawal of recognition did not constitute an ULP because *it* was based on a genuine, reasonable uncertainty about the

Union's majority status. In particular, MHC argues that the antiunion petitions received by the employer on October 20 were adequate under *Allentown Mack* to support the employer's withdrawal of recognition from the Union. The Board credited the petition signatures that were dated before September 11, 1998, because they were executed while the parties were still bargaining. MHC thus argues that the level of employee dissatisfaction on October 20 was sufficiently high to give rise to a genuine, reasonable uncertainty about the Union's majority status, which, MHC claims, is all that is required under *Allentown Mack*. The Board rejected this view, finding that "the bargaining unit consisted of 157 employees, but only 69 employee signatures on the antiunion petitions can be counted, 10 short of a majority. Such a showing is insufficient to establish a good-faith reasonable uncertainty as to the Union's continuing majority status." *Id.* at *5 (citation omitted).

Before reaching judgment in this case, the Board issued its decision in *Levitz Furniture Co. of the Pac.*, 333 N.L.R.B. No. 105, 2001 WL 314139 (2001), announcing that it would no longer apply the *Allentown Mack* "good-faith reasonable doubt" standard in future "withdrawal of recognition" cases. Instead, employers will be required to show "the Union's actual loss of majority status" in order to justify a unilateral withdrawal of recognition from an incumbent union. *Id.* at *2. In this case, however, the Board purported to apply the existing standard under *Allentown Mack*, not the new test announced in *Levitz*. *See Marion Hospital*, 2001 WL 1126579, at *3 (the *Levitz* "analysis and conclusions . . . [will] be applied only prospectively; 'all pending cases involving withdrawals of recognition [will be decided] under existing law: the "good-faith uncertainty" standard as explicated by the Supreme Court' in [*Allentown Mack*]") (citing *Levitz*, 2001 WL 314139, at *18).

MHC argues that, in focusing on whether the antiunion petitions fell "short of a majority," the Board, in fact applied *Levitz*, not *Allentown Mack*, in deciding the instant case. The Board, of course, disclaims any such sleight of hand. We agree with our colleague, Judge Williams, that the Board's

analysis of the *Allentown Mack* issue leaves something to be desired. We also agree that the Board will be well-served in future cases to state clearly the type and quantum of evidence needed to establish a "good-faith reasonable doubt." *Levitz* makes this standard irrelevant in future withdrawal of recognition cases, but the Board still applies the "genuine, reasonable uncertainty" test in other contexts. *See Levitz*, 2001 WL 314139, at *2.

In the end analysis, however, we uphold the Board's bargaining order, because MHC's initial unlawful refusal to bargain – beginning on September 11 and continuing unabated through the October 28 withdrawal of recognition – set the stage for the October 20 presentation of the petitions to MHC. As noted in *Lee Lumber*, a withdrawal of recognition following an unlawful refusal to bargain is illegal unless the employer can show that the preceding refusal to bargain was "cured." *Lee Lumber*, 117 F.3d at 1458. Otherwise, an employer can effectively "withdraw recognition" from a union by simply refusing to bargain and then waiting for evidence of employee disaffection sufficient to claim a "good-faith reasonable doubt" under *Allentown Mack*. And such disaffection is the almost certain result if employees see that their bargaining agent is ineffective because of the employer's steadfast refusal to bargain with the union. *See id.* at 1459 ("[I]t is rational to presume a link between a prior unlawful refusal to bargain and a subsequent employee repudiation of the union because '[l]engthy delays in bargaining deprive the union of the ability to demonstrate to employees the tangible benefits to be derived from union representation. Such delays consequently tend to undermine employees' confidence in the union by suggesting that any such benefits will be a long time coming, if indeed they ever arrive.' ") Such gambits surely are inconsistent with the goals of the NLRA.

It is no answer here that 44% of the bargaining unit employees signed petitions before September 11, because we have no way of assessing whether or how the sentiments of those employees might have changed in light of MHC's unlawful refusal to bargain on and after September 11. We do not know, for example, whether these workers became

more or less supportive of issuing the petitions after learning that MHC was stonewalling the collective bargaining process by refusing to bargain. Although MHC argues, unconvincingly, that it did not refuse to bargain on September 11, it has never seriously contended that it possessed a good-faith reasonable doubt on that date sufficient to withdraw recognition from the Union. Indeed, the employer did not even attempt to withdraw recognition until late October. And, as noted above, because nothing happened after September 11 to "cure" the ongoing refusal to bargain, the subsequent withdrawal of recognition is unjustified. In other words, the withdrawal of recognition on October 28 was merely the anticlimactic end to the events that commenced on September 11.

Finally, we conclude that the Board was warranted in issuing the order to bargain. One might ask whether the Board would have issued a bargaining order in the absence of the October 28 withdrawal of recognition. In other words, is the ongoing refusal to bargain that commenced on September 11, *standing alone*, enough to warrant a bargaining order? And what did the Board mean to say about this? We think, on the record at hand, there is little doubt that the Board meant to issue the bargaining order for *either* the ongoing refusal to bargain that commenced on September 11 *or* the October 28 withdrawal of recognition, *or both*, for they were inextricably connected.

It is true that the Board here said that "[a]n affirmative bargaining order in this case vindicates the Section 7 rights of the unit employees who were denied the benefits of collective bargaining by the employer's withdrawal of recognition." *Marion Hospital*, 2001 WL 1126579, at *7. However, the Board went on to make it clear that the remedy was specifically linked to the ongoing refusal to bargain. Thus, the Board explicitly found that a bargaining order was necessary because

> it removes [MHC's] incentive to delay bargaining in the hope of further discouraging support for the Union. . . . [and] [MHC]'s unfair labor practice was of a continuing nature and was likely to have a

> continuing effect, thereby tainting any employee di-
> saffection from the Union arising during that period
> or immediately thereafter.

*Id.* This language makes it clear that the Board intended to issue a bargaining order for MHC's refusal to bargain. The withdrawal of recognition was an unessential conclusion of the chain of events set into motion by MHC's September 11 letter to the Union. Therefore, an affirmative order to bargain was entirely justified. Relying on substantial evidence in the record as a whole, as well as its own expertise in labor relations, the Board determined that an affirmative bargaining order was necessary to vindicate employees' rights to bargain, consistent with the Act's overall goal of maintaining industrial peace, and that the remedy was necessary to resolve the refusal to bargain in this case. *Vincent Indus. Plastics*, 209 F.3d at 738. In other words, the Board reasonably concluded that an affirmative bargaining order was necessary to assure that MHC would not benefit from its prolonged and illegal efforts to cut off bargaining and thereby topple the Union.

In reaching this conclusion, we note that this is not a case like *Lee Lumber* in which the Board's insistence on the bargaining order would have prevented the employees from obtaining a representation election. Should MHC's employees by further petition or otherwise request such an election, the propriety of continuing a bargaining order would be for a new decision of the Board on a later date.

## III. CONCLUSION

The decision of the Board is supported by substantial evidence and is consistent with the law. Accordingly, we deny MHC's petition for review and grant the cross-petition by the Board to enforce its orders.

1

WILLIAMS, *Senior Circuit Judge, dissenting in part*: I agree with the conclusions of the panel opinion, with one important exception. I do not think that the Board seriously or adequately confronted the fact that when Marion Hospital withdrew recognition on October 28, 1998, it had in hand petitions which, after we exclude signatures "tainted" by the September 11 refusal to bargain and signatures of persons not in the unit, amounted to 44% of the unit employees. For me this raises a vexing issue under *Allentown Mack Sales & Serv. v. NLRB*, 522 U.S. 359 (1998), which perhaps the Board could answer with reasoned decisionmaking, but has not. And because the Board's justification for the affirmative bargaining order evidently depended in part on finding the October 28 withdrawal of recognition unlawful, I would remand the case for it to consider the matter.

\*   \*   \*

On October 20, 1998 Marion received petitions purporting to carry the signatures of 82 of the 157 bargaining unit employees. The Board excluded seven on the ground that they were not members of the unit. And it excluded another six on the ground that their signatures were dated after September 11 and thus presumptively tainted by the refusal to bargain of that date. See *Lee Lumber & Bldg. Material Corp. v. NLRB*, 117 F.3d 1454 (D.C. Cir. 1997). After the Board's deductions, the number of bargaining unit employees expressly disavowing the union was 69, or 44% of the total.

As the panel opinion notes, *Allentown Mack* authoritatively construed the applicable Board standard: "good-faith reasonable doubt" or "genuine, reasonable uncertainty," based on objective considerations and "supported by evidence external to the employer's own (subjective) impressions." *Allentown Mack*, 522 U.S. at 367 & n.2. Explaining the type of uncertainty or doubt required, the Court said:

> "Doubt" is precisely that sort of "disbelief" (failure to believe) which consists of an uncertainty rather than a belief in the opposite. If the subject at issue were the existence of God, for example, "doubt" would be the

disbelief of the agnostic, not of the atheist. A doubt is an uncertain, tentative, or provisional disbelief.

*Id.* at 367. Although *Allentown Mack* involved a combination of several express disavowals of the union and other evidence (including statements from a union shop steward), the Court said that some number of express disavowals *alone* sufficed to create a good-faith reasonable uncertainty:

The Board did not specify how many express disavowals would have been enough to establish reasonable doubt, but the number must be less than 16 (half of the bargaining unit) since that would establish reasonable *certainty*.

*Id.* at 368–69 (emphasis in original). The Court seems to be saying at a minimum that disavowals from 15 in the bargaining unit of 32 (i.e., the largest possible number under 50%) would have been enough to establish the requisite "uncertainty." 15/32 would, of course, have been 46.8%. On its face, then, one would expect the Board to undertake some subtle explanation of why 46.8% sufficed to create uncertainty in *Allentown Mack*, but 44% does not do so here. Instead, it simply declared that the 44% were "insufficient to establish a good-faith reasonable uncertainty." See 335 N.L.R.B. No. 80, 2001 WL 1126579, at *5.

Although the *Allentown Mack* Court nowhere qualified the language just quoted, it may have been colored by context. As noted above, there was softer (i.e., less quantitative) evidence supporting "uncertainty," including the statement of a member of the union's bargaining committee and shop steward that it was his feeling that the employees did not want a union, and that " 'with a new company [transfer of the business was in fact imminent], if a vote was taken, the Union would lose.' " *Id.* at 362. Further, it may be that statements of individual workers adding up to less than a majority generate more reasonable doubt than less-than-a-majority names on a petition, as the latter suggests an organized effort, and the lack of a majority may suggest the circulators' inability to attract additional signatures. But we have no discussion of any of this from the Board—no indication that the Board applied its "fund of knowledge and expertise"

about labor relations to what appears to be a close question. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 612 n.32 (1969).

Although the Board is giving up even nominal allegiance to the *Allentown Mack* test in the context of withdrawal of recognition, see *Levitz*, 333 N.L.R.B. No. 105, 2001 WL 314139, the *Allentown Mack* test has significance for the future. The Board explained in *Levitz* that it was retaining the test as the basis on which employers can obtain a Board-certified election. *Id.* at *2 ("We have also decided to allow employers to obtain RM elections by demonstrating good-faith uncertainty (rather than disbelief) as to unions' continuing majority status."). Time spent by the Board articulating the test's meaning will by no means be wasted, quite apart from fairness to the litigants here.

Does the Board's failure of analysis require a remand? The court appears to take the position that the October 28 withdrawal of recognition was completely tainted regardless of the number of signatures obtained before September 11, for want of a "cure" of the September 11 refusal to bargain. Maj. Op. at 3, 14. On this view the subtleties of *Allentown Mack* are irrelevant. But the Board disclaimed any idea of total taint; overruling the ALJ, it held that the taint extended only to signatures obtained *after* the refusal to bargain. See 335 N.L.R.B. No. 80, 2001 WL 1126579, at *4. ("Therefore, under *Lee Lumber*, only employee signatures dated *after* September 11 are presumptively tainted by the unlawful refusal to bargain. No such presumption of unlawful taint attaches to those employee signatures dated *before* September 11.") (emphasis in original).

Alternatively, we might disregard problems with the Board's view of the October 28 withdrawal of recognition on the theory that it would have issued the bargaining order anyway. Perhaps so. But the Board suggested nothing of the sort, and there is no special reason to think so. Indeed, the bulk of its opinion is devoted to October 28, and its justification for the bargaining order speaks consistently of the employer's "withdrawal of recognition" (the Board's precise finding for the October 28 conduct), as opposed to the

4

"refusal to bargain" (its precise label for September 11). Our oft-repeated ruling that a bargaining order is an "extreme remedy that must be justified by a reasoned analysis," see, e.g., *Vincent Indus. Plastics v. NLRB*, 209 F.3d 727, 738 (D.C. Cir. 2000), would seem to call for explicit consideration by the Board when one of two supports for an order (seemingly the larger one) falls for want of reasoned decisionmaking.