In the

# United States Court of Appeals
## For the Seventh Circuit

Nos. 08-3517, 08-3518, 08-3709 & 08-3859

NEW PROCESS STEEL, L.P.,

*Petitioner/Cross-Respondent,*

*v.*

NATIONAL LABOR RELATIONS BOARD,

*Respondent/Cross-Petitioner.*

On Petition for Review of an Order of
the National Labor Relations Board.

ARGUED APRIL 10, 2009—DECIDED MAY 1, 2009

Before BAUER, FLAUM, and EVANS, *Circuit Judges*.

FLAUM, *Circuit Judge*. After negotiating a new collective bargaining agreement with New Process Steel, the owner of a plant in Butler, Indiana, the union representing the employees of that plant took the agreement back to its members. A majority of the union members voted against accepting the contract, which contained substantial take-aways, but an insufficient number voted to

strike. So, according to its rules, the union had to accept the contract. New Process then refused to recognize the contract, claiming that in negotiations they had insisted on "ratification" and that the agreement was several votes short of a majority (and thus unratified). The union's members, unhappy about accepting the contract, then petitioned to decertify the union as their exclusive bargaining representative, and New Process withdrew recognition from the union. The union responded by filing unfair labor practices claims with the NLRB for the company's failure to recognize the collective bargaining agreement and deal with the union as the exclusive representative of the plant's employees, and prevailed before the ALJ and the Board. The company now petitions this court, asking us to find that the agreement was invalid, and the NLRB cross-petitions for an order enforcing its decisions.

For the following reasons, we affirm the NLRB's decisions and enter judgment enforcing its orders in full.

## I. Background

New Process Steel (New Process or the company) operates four steel processing facilities in the United States, and one in Mexico. In September 2006, the company needed to negotiate a collective bargaining agreement with the employees at its facility in Butler, Indiana. The International Association of Machinists and Aerospace Workers, AFL-CIO, was certified as the exclusive bargaining representative of those employees. On or around September 6, 2006, the two sides sat down to begin negotiations. The company was represented by an attorney,

Mike Oesterle, and the plant manager in Butler, Steve Hartz. The record does not reveal who initially led negotiations for the union, but in April 2007 Joseph Chaszar took over as the bargaining representative for the union, and he saw the negotiations through to the end.

The parties met approximately twenty-five times during the course of negotiations, which ran from September 2006 to August 2007, and the company ultimately made about forty-six written counter-proposals. As they agreed on terms, the parties had a practice of signing or initialing tentative agreements, known as "TA'ing" a provision. On August 9, 2007, the parties completed their negotiation on the last substantive term, and Chaszar signed the final provision. Chaszar then told the negotiators, "I will agree to your entire proposal" and signed the proposal in its entirety. Chaszar then slid the proposal over to Oesterle, who refused to sign. One of the union representatives angrily demanded, "you [expletive] TA'ed everything else, why don't you sign off on this so we can get out of here?" Chaszar also asked why the company's representatives refused to sign, given that the parties had previously signed off on all proposals that they had agreed to. Oesterle told the union negotiators that once the contract was ratified the company would sign it. Chaszar said he wanted to hold a union vote that day, but the company insisted that they had production scheduled and the union would "have to do it on your own time."[1]

---

[1] New Process' representatives explained that they insisted on union ratification because they had heard grumbling about the

(continued...)

Chaszar scheduled the vote that weekend.

The administrative law judge found that this was the only time the parties verbally discussed the idea of ratifying the contract, and this discussion did not include the form that union ratification should take. The parties had exchanged written documents referencing the idea three times, however. One of those exchanges was in the final proposal: a condition that the wage agreement went into effect "[b]eginning the effective date of this agreement, or on the date the total Agreement is properly ratified, signed and executed, whichever is later. . . ." The employer's initial set of bargaining proposals from October 2006 also provided that, "[i]t is the company's position that these agreements will not become contractually effective until the day and date that a total agreement on all parts of the contract is reached, ratified, and signed by the parties." Finally, in a letter from July 2007 that Oesterle wrote summarizing the progress of negotiations, he again stated that, [t]he company proposes a one-year deal, effective the date the contract is signed, executed, and ratified, whichever is later." However, the letter listed this as an "open" proposal, meaning it was one that the company had offered but that the union had not yet accepted.

---

[1] (...continued)
union among employees. Hartz told the ALJ that, "There was a lot of talk in the shop about [ ] decertifying . . . and . . . this contract had a lot of take-aways and . . . [New Process wanted] to make sure they had an opportunity to, you know, voice their opinion, and vote for the contract and let their voice be heard."

The union held its vote on Sunday, August 12 at a local hotel, with about twenty-three employees in attendance (the Butler facility had approximately thirty-two employees total). Cheszar started the vote by explaining how the process would work. First, the employees would vote on the contract. If a majority of the employees did not vote to approve the contract, the union would then take a vote to strike. Union by-laws required a two-thirds vote in order to strike. If the employees did not vote to approve the contract but also did not pass a strike resolution, the union would accept the contract. This procedure, which Cheszar explained at the beginning and end of the meeting, is contained in a printed union circular. The rule has a simple rationale: IAM believes that if employees vote not to accept a contract but also do not pass a resolution to strike for better terms, the union negotiators lack the necessary leverage to negotiate a more favorable agreement and must accept the contract proposal that they have in hand.

After Chaszar outlined the terms, the union conducted a secret ballot vote on the contract. The employees rejected the proposal by a margin of about one or two votes. Chaszar then explained that they were going to take a strike vote, and that a two-thirds majority was needed for that resolution to pass. The strike resolution failed. The union representatives told the employees that the contract was enacted, because the union did not have enough votes to go on strike. Chaszar called New Process later that day and told them they had an agreement. New Process' representatives then executed the collective bargaining agreement.

A few days later, Hartz called New Process' CEO at the corporate headquarters in Houston and told him about some employee complaints he had received regarding the manner in which the union accepted the contract. On September 11, 2007, New Process' outside legal counsel sent Cheszar a letter stating that the company was resuming negotiations and did not accept the latest agreement because it had not been ratified by a majority vote. "Since ratification was an express precondition to the agreement," the letter concluded, "it is clear that there is not nor has there ever been a contract between the company and the union." The company informed the union the next day, September 12, that it had received a decertification petition from the employees of the Butler facility and was withdrawing its recognition from the union as a result.

The IAM then filed an unfair labor practices charge with the National Labor Relations Board (NLRB or Board) on September 17, 2007, and the general counsel of the NLRB issued a complaint based on that charge. The NLRB alleged that New Process violated § 8(a)(1) and (5) of the National Labor Relations Act by wrongfully repudiating a valid collective bargaining agreement, and § 8(a)(1) and (5) and § 2(6) and (7) of the NLRA by withdrawing recognition from the union. New Process filed an answer denying all of the allegations. The matter was tried before an Administrative Law Judge who issued findings of fact and conclusions of law with respect to the complaint, ruling that the ratification-by-majority-vote provision that New Process insisted was a condition of the agreement had not been agreed on by both parties and that

New Process lacked standing to raise other complaints about the ratification process that the union employed. New Process then appealed the decision of the administrative law judge to the NLRB. The Board adopted the ALJ's findings and conclusions. In a separate decision, the Board also ordered New Process to cease and desist from its refusal to deal with IAM as the bargaining representative of its employees. The NLRB concluded that New Process and IAM had enacted a valid collective bargaining agreement and that the union enjoyed "a conclusive presumption of majority status" during the term of a collective bargaining agreement. New Process sought review of the NLRB's decisions in this court, and the Board petitioned for orders enforcing its judgment. Those cases are consolidated in this appeal.

## II. Discussion

This court applies a circumscribed standard of review to rulings of the NLRB. *SCA Tissue North America LLC v. NLRB*, 371 F.3d 983, 987 (7th Cir. 2004). We review its factual findings for substantial evidence and its legal rulings for a reasonable basis in law. *Sears, Roebuck & Co. v. NLRB*, 349 F.3d 493, 502 (7th Cir. 2003). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support the conclusion of the Board." *Huck Store Fixture Co. v. NLRB*, 327 F.3d 528, 533 (7th Cir. 2003). Under the substantial evidence test, a reviewing court may not "displace the Board's choice between two fairly conflicting views, even though the court would justifiably have made a different choice

had the matter been before it de novo." *Universal Camera v. NLRB*, 340 U.S. 474, 488 (1951); *see also NLRB v. Nevada Consolidated Copper Corp.*, 316 U.S. 105, 106 ("If the findings of the Board are supported by evidence the courts are not free to set them aside, even though the Board could have drawn different inferences."). When the board adopts an ALJ's findings of fact and conclusions of law, as it did here, we review those determinations. *Sears, Roebuck*, 349 F.3d at 508.

## A. NLRB's jurisdiction

New Process' first objection to the NLRB's orders is that it lacks authority to issue them in the first place. A little background information is needed for this argument. The NLRB, by statute, consists of five members. Those members are appointed by the President with the advice and consent of the Senate and serve staggered five year terms. 29 U.S.C. § 153(a). Also by statute, the NLRB is allowed to delegate the authority of the five member body to smaller, three member panels. This delegation process was spelled in § 3(b) of the NLRA:

> The Board is authorized to delegate to any group of three or more members any or all of the powers which it may itself exercise . . . A vacancy in the Board shall not impair the right of the remaining members to exercise all of the powers of the Board, and three members of the Board shall, at all times, constitute a quorum of the Board, except that two members shall constitute a quorum of any group designated pursuant to the first sentence hereof.

29 U.S.C. § 153(b). On December 28, 2007, with one seat already vacant and another member's term about to expire, the four members of the Board delegated all of its authority to a three member panel. When the recess appointment of one member of that group of three expired three days later, the remaining two members proceeded as a quorum. As of January 2009, the NLRB had issued over 300 opinions, both published and unpublished, through this two-member quorum. New Process alleges that this delegation procedure violates both the plain meaning of § 3(b) of the NLRA and the purpose of that act as embodied in the relevant legislative history because it was in fact a delegation to a two-member panel rather than a three-member panel.

We begin with the plain meaning of the statute. New Process claims that the Board's delegation was improper in the first instance. The third member, whose term was about to expire, was in New Process' view a phantom member who would not actually consider the cases before the Board. New Process claims that this procedure violated the plain meaning of the first sentence of the act because it is not a delegation to "three or more" members of the NLRB, but only to two members. The upshot of New Process' view, as their counsel explained at oral argument, is that the first sentence of § 3(b) restricts the Board from acting when its membership falls below three.

The NLRB argues that the statute at issue is clear that the vacancy of one member of a three member panel does not impede the right of the remaining two members to execute the full delegated powers of the NLRB. As the

NLRB delegated its full powers to a group of three Board members, the two remaining Board members can proceed as a quorum despite the subsequent vacancy. This indeed is the plain meaning of the text. As we read it, § 3(b) accomplished two things: first, it gave the Board the power to delegate its authority to a group of three members, and second, it allowed the Board to continue to conduct business with a quorum of three members but expressly provides that two members of the Board constitutes a quorum where the Board has delegated its authority to a group of three members.[2] The plain meaning of the statute thus supports the NLRB's delegation procedure.

This reading is also in line with the two other circuit courts to consider this issue. Because the NLRB has been issuing decisions through a two-member quorum since 2007, the issue is pending in several circuits at this time.[3]

---

[2] Contrary to New Process' assertions, this reading does not deprive the first sentence of the section of its meaning. The first sentence establishes a requirement for delegation in the first instance, while the vacancy and quorum provisions allow the Board to proceed in the event that the terms of Board members subsequently expire. New Process' reading, on the other hand, appears to sap the quorum provision of any meaning, because it would prohibit a properly constituted panel of three members from proceeding with a quorum of two.

[3] The D.C. Circuit heard oral argument on this issue in *Laurel Baye Healthcare of Lake Lanier, Inc. v. NLRB*, Nos. 08-1162, 08-1214, while the Second and Eighth Circuits have pending cases

(continued...)

The First Circuit is so far the only one to address the issue in a published opinion. In *Northeastern Land Services v. NLRB*, No. 08-1878 (1st Cir. Mar. 13, 2009), the court held that, "[t]he Board's delegation of its institutional power to a panel that ultimately consisted of a two-member quorum because of a vacancy was lawful under the plain text of section 3(b)." *Slip op.* at 11. As the First Circuit pointed out, this result is also consistent with an Office of Legal Counsel memorandum concluding that, "In our view, if the Board delegated all of its powers to a group of three members, that group could continue to issue decisions and orders as long as a quorum of two members remained." Quorum Requirements, Memorandum from M. Edward Whelan III, Principal Deputy Assistant Attorney Gen., Office of Legal Counsel, (Mar 4. 2003), *available at* 2003 WL 24166831.

In a case decided well before the current vacancies, the Ninth Circuit upheld the NLRB's ability to act in panels of two if there is a resignation or vacancy in a properly constituted panel of three. *Photo-Sonics Inc. v. NLRB*, 678 F.2d 121 (9th Cir. 1982). The petitioner in *Photo-Sonics* argued that the order in that case was invalid because one member of the panel of three left the Board prior to the release of the decision. *Id.* at 122. The Ninth Circuit rejected that argument, holding that under § 3(b) two members was a quorum and that courts had interpreted

---

[3] (...continued)
raising the same issue. *Snell Island SNF v. NLRB*, No. 08-3822, 08-4336 (2nd Cir.); *NLRB v. Whitesell Corp.*, No. 08-3291 (8th Cir.).

quorum as "the number of the members of the court as may legally transact judicial business." *Id.* (quotation omitted). New Process attempts to distinguish *Photo-Sonics* by arguing that the third Board member in that case participated in the underlying decision, while in this case the decision was made by a panel of two. By its terms, however, § 3(b) contains no requirement about whether a vacant Board member needs to have heard evidence or participated in a decision in order for the quorum requirement to apply. As long as the panel consisted of three NLRB members at the time it was constituted, *Photo-Sonics* is persuasive authority endorsing the NLRB's reading of the statute.

When the plain meaning of a statute is unambiguous, we need not consider a statute's legislative history or analogous cases in order to interpret it. *See United States v. Easter*, 553 F.3d 519, 526 (7th Cir. 2009) ("Where, as here, the plain meaning of the statute is unambiguous, that is the end of the matter."). However, we also take time to note that the legislative history behind § 3(b) does not support New Process' reading of the statute. § 3(b) of the NLRA was amended by the Taft-Hartley Act, which expanded the size of the NLRB from three members to five. The Taft-Hartley Act itself was a compromise between competing House and Senate revisions of the original National Labor Relations Act. The House version created a Labor-Management Relations Board of three members whose sole duty was to decide cases. H.R. Rep. No. 80-245, at 25 (1947). The Senate version expanded the size of the NLRB from three members to seven but included the delegation and quorum provisions. S. Rep. 80-105, at 19

(1947). The eventual bill, which expanded the NLRB to five members, was a compromise between the two versions.

New Process insists that the Taft-Hartley revisions were designed to make the NLRB function more like a court of appeals and to bring a greater variety of opinions into the review of administrative decisions. It is true that the Congressional framers of the Taft-Hartley Act were concerned with the quality of the adjudicative work of the Board, but their primary concern was increasing the efficiency of the Board.[4] "There is no field in which time is more important, yet the Board is from 12 to 18 months behind in its docket. . . . The expansion of the Board from three to seven members, which this bill proposes, would permit it to operate in panels of three, thereby increasing by 100 percent its ability to dispose of cases expeditiously in the final stage. . . ." S. Rep. No. 80-105, at 8 (1947). The purpose of the revisions, then, was to allow the NLRB to hear more cases by creating panels of the entire

---

[4] The House's report on the proposed bill clearly expressed misgivings with the construction of the Board under the Wagner Act, arguing that, "[a]cting as prosecutor, judge, and jury, and to all intents and purposes its own Supreme Court insofar as its findings of fact are concerned, the Board seems to have found the temptation to be arrogant, arbitrary, and unfair irresistible." H.R. Rep. No. 80-245, at 25 (1947). Congress saw the remedy to this problem in structural changes to the Board, however, such as abolishing the Review Division. *Id.* The House Report did not even mention any vacancy or quorum provisions in its discussion of the proposed changes to § 3. *Id.*

Board. There is no suggestion in the relevant reports that the Board is restricted from acting when its membership falls below a certain level, as New Process would have it. Indeed, a court interpreting the statute that way would hinder the efficient panel operation that Congress intended to create. *See also Hall-Brooke Hospital v. NLRB*, 645 F.2d 158, 162 n.6 (2d Cir. 1981) ("Congress added [§ 3(b)] to the NLRA to enable the Board to handle an increasing caseload more efficiently.").

To find support for its reading of the statute in the legislative history, New Process would need statements establishing that the Board was forbidden from operating with a quorum of two, or that Congress was particularly concerned about delegating authority to Board members whose term was about to expire. They have produced nothing to that effect. To the extent that the legislative history points either way in this case, then, it establishes that Taft-Hartley created a Board that functioned as an adjudicative body that was allowed to operate in panels in order to work more efficiently. Forbidding the NLRB to sit with a quorum of two when there are two or more vacancies on the Board would thus frustrate the purposes of the act, not further it.

Finally, New Process argues that the NLRB's delegation process is invalid because the Supreme Court has disapproved of similar "quorum" procedures in analogous situations. They rely on the Supreme Court's decision in *Nguyen v. United States*, 539 U.S. 69 (2003), which held that a circuit court of appeals could not operate with a panel of two Article III judges and a third Article IV judge. The

statute at issue in *Nguyen*, 28 U.S.C. § 46, requires "the hearing and determination of cases and controversies by separate panels, each consisting of three judges." 28 U.S.C. § 46(b). The Court held that a panel consisting of fewer than three judges was not a properly constituted panel even if two Article III judges constituted a quorum of a panel of three.

There are two ways to distinguish *Nguyen* from the present case. First, 28 U.S.C. § 46 contains no delegation or quorum clauses, simply a requirement that panels consist of three judges. Second, the Court in *Nguyen* found while examining the legislative history that Congress amended 28 U.S.C. § 46 in part because of concerns about circuits routinely assigning cases to panels of two. *Nguyen*, 539 U.S. at 83. But § 3(b) was not motivated by similar concerns, and indeed contains quorum and delegation clauses that cover the scenario at issue here.

Additionally, a number of administrative law opinions hold that a public board has the authority to act despite vacancies because the board, rather than the individual members, has the authority to act, a principle that suggests the NLRB has the authority to act so long as they have satisfied the quorum requirements. *See, e.g., FTC v. Flotill Prods., Inc.*, 389 U.S. 179, 183-86 (1967) (common law quorum rules apply to public bodies). This principle is borne out in other court decisions allowing administrative agencies to operate with a quorum of remaining members. *See Falcon Trading Group, Ltd. v. SEC*, 102 F.3d 579, 582 (D.C. Cir. 1996) (SEC allowed to create quorum rules permitting the commission to operate with only

two of five members); *Railroad Yardmasters of Am. v. Harris*, 721 F.2d 1332, 1335 (D.C. Cir. 1983) (National Mediation Board allowed to operate with only one of three members).

We ruled on a similar issue in *Assure Competitive Transp. Inc. v. United States*, 629 F.2d 467, 473 (7th Cir. 1980). *Assure* concerned the Interstate Commerce Commission, which by statute has eleven members but, because of vacancies, had dwindled to six members by the late 1970s. The ICC asked Congress to amend the statutory language of its quorum rules to allow the commission to act with a quorum of the remaining commissioners rather than with a quorum of the entire number of seats on the board. *Id.* at 474. This court held that the quorum rules permitted the ICC to act with fewer than the full complement of the six remaining board members, so long as a quorum of the current board was present. *Id.* New Process argues that this actually undercuts NLRB's position, because the ICC went to Congress for permission to act with a quorum of the remaining board, which the NLRB did not do. This argument presumes, however, that the NLRB is acting outside of its statutory authority or that, in other words, we accepted New Process' plain meaning argument. Given that the plain meaning of the statute supports NLRB's reading of the statute, New Process' interpretation of *Assure* is unpersuasive.

We thus find that the NLRB had authority to hear the labor dispute in this case and to issue orders regarding the unfair labor practices claim and New Process' withdrawal of recognition from the union, and proceed to the merits of the case.

### B.  Validity of the collective bargaining agreement

New Process' argument on the merits consists of two claims. First, they argue that because ratification of the contract was a condition precedent to implementation of the agreement, the agreement between New Process and the union was never final. Second, they argue that if the union believed that the phrase "ratification" did not mean a straight up-or-down vote by the union's members that there was no "meeting of the minds" between the union and New Process and thus no valid agreement.

### 1.  Meaning of "ratification"

The ALJ rejected New Process' argument that there was never a valid contract between New Process because the union never "ratified" the contract according to the terms of the parties' agreement. The ALJ found that the three references to "ratification" during the course of the negotiations were cursory and did not include an agreement on the procedure or method for ratification. In the absence of such an agreement, the ALJ determined that the IAM was allowed to select its own method of ratification and that New Process did not have standing to object to that method.

The NLRB has traditionally insisted that the method of ratification a union chooses to employ is a matter between the union and its members and not something the company can question. *See Childers Products Co.*, 276 NLRB 709, 711 (1985) ("the method of ratification was within the [u]nion's exclusive domain and control . . ."); *see also*

*Valley Central Emergency Veterinary Hospital*, 349 NLRB 1126, 1127 (2007) ("Board law is clear that [employer] has no standing to challenge [the union's] ratification process."). Nor is a company allowed to challenge whether a union properly followed its own internal ratification procedures. The litigants with standing to make that challenge are the members of the union themselves, not their employer. *See Martin J. Barry Co.*, 241 NLRB 1011, 1013 (1979). The reason that the union is given such wide latitude is concern for union independence. Federal labor law has a general policy forbidding employers to place conditions on how a union structures its internal relations with its own members, lest a company subvert the union and create a structure whereby it deals with employees directly. *See NLRB v. Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342, 350 (1958).

New Process now argues that the ALJ's decision was inconsistent with prior decisions from the NLRB, in particular *Beatrice/Hunt-Wesson, Inc.*, 302 NLRB 224 (1991) and *Hertz Corporation*, 304 NLRB 469 (1991). In *Beatrice*, the Board dismissed similar allegations against an employer who refused to recognize a collective bargaining agreement. During negotiations over that agreement, the parties explicitly agreed that the contract would have to be ratified by the members of the bargaining unit (as opposed to just the members of the union, a key difference) and set this agreement down in a memorandum. *Beatrice*, 302 NLRB at 224. The bargaining unit employees repeatedly rejected the contract until the union obtained what it took to be sufficient ratification from the members of the union itself, although the "ratification"

was actually the vote of a single individual. *Id.* The NLRB held that when the parties have agreed on a method and process for ratification, an employer can rightly insist that the method be followed before it recognizes the collective bargaining agreement. *Id.* at 225. In *Hertz*, a union and an employer expressly agreed that a tentative collective bargaining agreement was not effective until it was ratified. *Hertz*, 304 NLRB at 472. The union, however, never held a ratification vote on the agreement. *Id.* at 471. The Board held that an employer's refusal to recognize the agreement was not an unfair labor practice where the parties agreed upon ratification as a condition precedent and the union failed to satisfy that condition. *Id.* at 469.

New Process does not contend that the discussions produced an agreement defining "ratification," but they claim that the term is well-established within labor relations negotiations, and means a straight up-or-down vote by members of the union. The ALJ and the Board, however, did not agree that the meaning of the term is so obvious nor that it has a prevailing meaning. They found that New Process' definition is not unreasonable, but that it is "contrary to the way the IAM and other unions proceed." Indeed, other decisions from the NLRB refer to similar multi-step ratification methods. *See Childers Products Co.*, 276 NLRB at 711.

The factual finding here is supported by substantial evidence. The record reflects that three counter-proposals

from New Process referred to "ratification."[5] None of those
counter-proposals, however, referred to a method of
ratification. New Process only discussed its desire to
make ratification a condition precedent after the parties
completed negotiation, and there the discussion was
about ratification, full stop, with no discussion of process
or method. New Process argues that Chaszar, in his
deposition testimony, admitted that he understood
"ratification" to mean a majority vote on the contract
and that this condition was not satisfied. However, the
phrase he was actually asked about was "a vote," which
he took to mean majority rule. With respect to ratifica-
tion, Chaszar testified that he meant "how we process
our ratification," and that, "[i]f it was a positive vote, we
had an agreement. If it was a negative vote, we go to the
second vote," although he did say that he did not go over
this process with the company's representatives. That is
not clearly committing to New Process' preferred ratifica-
tion method. Nor would a union negotiator's tacit under-
standing necessarily be binding when the union already
has a method for ratifying contract proposals.

The Board's conclusion that New Process cannot refuse
to recognize the contract because the union did not
follow the company's definition of ratification also has a
reasonable basis in law. Long-standing precedents provide
a basis for the Board's ruling that New Process cannot

---

[5]  Those three counter-proposals were in New Process' opening
bargaining proposal in 2006, on page eighteen of its July 2007
letter summarizing bargaining, and the wage provision of the
tentative agreement.

insist on any particular method of ratification. *See, e.g., Childers Products Co.*, 276 NLRB at 711. New Process argues throughout their brief that the Board has essentially overruled *Beatrice* and *Hertz* and thus acted arbitrarily. An agency of course has a "duty to explain its departure from prior norms," *Atchison, T.&S. F. R. Co. v. Wichita Board of Trade*, 412 U.S. 800, 808 (1973), but the ALJ's decision below contains a long discussion of the meaning of *Beatrice* and *Hertz* and distinguishes them from the present case. New Process relies heavily on a line from a concurring opinion in *Beatrice*, stating that "[i]f indeed the parties have made employee ratification a part of the bargain, it is altogether appropriate that the Board give a measure of protection to the expectancy interests of the parties." *Beatrice*, 302 NLRB at 227 (Chairman Stephens, concurring). We agree with the Board and the ALJ, however, that this case did not involve an express agreement on a method of ratification, as *Beatrice* did, and that the union satisfied the ratification condition by following its two-step procedure.[6] In the absence of an express agreement otherwise, the ratification procedure was a matter within the union's control.

---

[6] New Process also argues that the IAM did not follow the ratification procedure; the union's circular requires the union to hold two strike votes, at the beginning and end of the vote on accepting the contract, while the union only held one. New Process, however, does not have standing to raise this claim, as it is a matter between the union and its members. *Martin J. Barry Co.*, 241 NLRB at 1013. New Process certainly does not claim an express bilateral agreement that the union would follow that ratification procedure.

### 2. No "meeting of the minds"

New Process argues in the alternative that there was simply no agreement between the company and the union: New Process meant ratification to mean an up or down vote and the IAM apparently meant a different process, and because of this disparity there was no meeting of the minds and thus no contract. The Board argues that a party's subjective understanding of a term cannot prevent a "meeting of the minds" because in federal labor law, as in common law, an agreement is judged by conduct evidencing an agreement rather than a party's subjective belief. *See MK-Ferguson Co.*, 296 NLRB 776 n.2. As the Board argues to this court, if New Process wanted a straight up-or-down vote, it should have asked for one.

New Process, of course, claims that it did just that when it asked for ratification. The company has difficulty finding evidentiary support for that claim, however. The ALJ discredited Hartz's claim that his "unexpressed understanding" throughout negotiations was an up-or-down ratification vote, and that credibility determination removed much of the factual support from New Process' claims about the meaning of ratification. Again, there is substantial evidence in the record supporting the ALJ's finding that the parties did not negotiate a meaning of "ratification" or a process for going about it, and the legal conclusion that the union was free to employ its own method of ratification is reasonable given the Board's precedents.

We affirm the Board's order finding that New Process violated § 8(a)(1) and (5) of the NLRA by repudiating the collective bargaining agreement.

### C. Recognition of union

New Process also appeals from the Board's order forcing it to recognize the IAM as a valid collective bargaining representative for employees in the Butler plant. New Process withdrew recognition from the union on September 12, 2007 because it had received an employee decertification petition protesting what the employees saw as excessive give-backs in the contract and an objectionable ratification procedure. The Board determined that the company could not withdraw recognition from the union so long as a valid collective bargaining agreement was in effect. The "contract bar" rule prevents an employer from petitioning for decertification of a union as an exclusive bargaining representative during the life of a collective bargaining agreement, and one consequence of that rule is that an employer cannot withdraw recognition from the union, either. *See Auciello Iron Works v. NLRB*, 517 U.S. 781, 785 (1996); *see also NLRB v. Dominick's Finer Foods, Inc.*, 28 F.3d 678, 683 (7th Cir. 1994).

Because of the contract bar, this issue turns on the validity of the collective bargaining agreement. If the agreement was valid, then the contract bar prohibited New Process from withdrawing recognition from the union. If not, then the company was free to do so. Here, since we affirm the Board's determination that New Process and the union entered into a valid one-year

collective bargaining agreement in August 2007, we affirm the Board's determination that New Process wrongfully withdrew recognition from the union in September 2007.

### III. Conclusion

For the foregoing reasons, we AFFIRM the decision of the Board and enter judgment enforcing its orders in full.