Certiorari dismissed, September 16, 2010

**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

NARRICOT INDUSTRIES, L.P.,

*Petitioner,*

v.

NATIONAL LABOR RELATIONS
BOARD,

*Respondent.*

SHIRLEY MAE LEWIS; HENRY
VAUGHAN,

*Intervenors.*

No. 09-1164

NATIONAL LABOR RELATIONS
BOARD,

*Petitioner,*

v.

NARRICOT INDUSTRIES, L.P.,

*Respondent.*

SHIRLEY MAE LEWIS; HENRY
VAUGHAN,

*Intervenors.*

No. 09-1280

On Petition for Review and Cross-application for
Enforcement of an Order of the
National Labor Relations Board.
(11-CA-21827; 11-CA-21828; 11-CA-21856)

Argued: September 23, 2009

Decided: November 20, 2009

Before KING and AGEE, Circuit Judges, and James P.
JONES, Chief United States District Judge for the Western
District of Virginia, sitting by designation.

_____

Petition for review denied and cross-application for enforce-
ment granted by published opinion. Judge King wrote the
opinion, in which Judge Agee and Judge Jones joined.

_____

**COUNSEL**

**ARGUED**: James Marion Powell, WOMBLE, CARLYLE,
SANDRIDGE & RICE, PLLC, Greensboro, North Carolina,
for Narricot Industries, L.P. William L. Messenger,
NATIONAL RIGHT TO WORK LEGAL FOUNDATION,
Springfield, Virginia, for Intervenors. Kellie Isbell,
NATIONAL LABOR RELATIONS BOARD, Washington,
D.C., for the National Labor Relations Board. **ON BRIEF**: J.
Mark Sampson, WOMBLE, CARLYLE, SANDRIDGE &
RICE, PLLC, Greensboro, North Carolina, for Narricot Indus-
tries, L.P. Ronald Meisburg, General Counsel, John E. Hig-
gins, Jr., Deputy General Counsel, John H. Ferguson,
Associate General Counsel, Linda Dreeben, Deputy Associate
General Counsel, Meredith L. Jason, Supervisory Attorney,
NATIONAL LABOR RELATIONS BOARD, Washington,
D.C., for the National Labor Relations Board.

_____

**OPINION**

KING, Circuit Judge:

Narricot Industries, L.P. ("Narricot"), petitions this Court for review of a Decision and Order entered against it by the National Labor Relations Board (the "Board"). *See Narricot Indus., L.P.*, 353 N.L.R.B. No. 82 (Jan. 30, 2009) (the "Board Decision"). The Board Decision affirmed, with modification, the rulings made by an administrative law judge (the "ALJ") in a decision (the "ALJ Decision") that is attached to the Board Decision. The Board has cross-applied in this Court for enforcement of the Board Decision. This matter presents two issues for our consideration: (1) whether the Board Decision was properly issued by a two-member quorum and, if so, (2) whether the Board Decision deserves enforcement on the merits. Because, as explained below, we answer both of those questions in the affirmative, we deny Narricot's petition for review and grant the Board's cross-application for enforcement.

I.

A.

Narricot, a Georgia corporation, is engaged in the business of manufacturing and dyeing narrow textile fabrics used to construct vehicle seatbelts.[1] Narricot has maintained a manufacturing facility in Boykins, Virginia, since the early 1960s, and the United Brotherhood of Carpenters and Joiners of America, Carpenters Industrial Council, Local No. 2316 (the "Union"), has represented the production and maintenance employees at the Boykins facility since 1976. The most recent collective bargaining agreement ("CBA") covering the Boykins bargaining unit employees was executed in February

---

[1]The facts spelled out herein are largely drawn from the Board Decision and the attached ALJ Decision.

2005 and remained in effect until October 2, 2007. By agreement of the Union and Narricot, the Union's representation of the production and maintenance employees was extended to also cover employees who work at Narricot's satellite facility in Murfreesboro, North Carolina. Although the most recent CBA did not provide for a wage increase, it provided for a "double-time" overtime premium for working in excess of forty-eight hours in a week.

The International Textile Group ("ITG"), a textile group that owns various (mostly nonunion) textile plants throughout the world, acquired the Boykins and Murfreesboro facilities in early 2007. After learning of the acquisition, the Union met with ITG representatives. By letter dated July 20, 2007, the Union notified Narricot that it desired to negotiate a new or modified CBA and proposed dates for the parties' negotiations. Bargaining sessions were conducted on July 30, August 28, September 19 and 20, and September 26, 2007. Union representative Jason Weitzel believed, based on the progress of the negotiations, that the parties could have reached an agreement during the next scheduled bargaining session on October 1, 2007. That session never occurred, however, due to Narricot's withdrawal of recognition from the Union on September 29, 2007, effective October 2, 2007 (the termination date of the parties' last CBA).

Narricot predicated the withdrawal of recognition on its receipt of a decertification petition signed by a majority of bargaining unit employees. As of October 1, 2007, there were approximately 329 bargaining unit employees — about 15 at the Murfreesboro facility, and the rest at the Boykins facility. The decertification petition was signed by 212, or 64%, of the bargaining unit employees. Following its withdrawal of recognition of the Union, Narricot made a number of "unilateral" changes, that is, it did not negotiate or bargain with the Union prior to making them. On November 11, 2007, Narricot eliminated the "double-time" overtime premium provided for in the last CBA and implemented the first employee wage increase

in four years. In addition, effective January 1, 2008, Narricot made changes to the fringe benefit programs for bargaining unit employees.

B.

The Union filed various unfair labor practice charges against Narricot in October 2007 and January 2008, and the Board issued a consolidated complaint and notice of hearing in February 2008. The consolidated complaint alleged the following: that Narricot violated § 8(a)(1) of the National Labor Relations Act (the "Act"), 29 U.S.C. § 158(a)(1), by promising employees increased benefits if they removed the Union as their bargaining representative; that Narricot further contravened § 8(a)(1) by soliciting employees to sign the decertification petition, by providing unlawful assistance to employees in the circulation of the petition, and by soliciting employees to separately withdraw from Union membership and revoke dues checkoff authorizations; and that Narricot violated § 8(a)(5) of the Act, 29 U.S.C. § 158(a)(5), by withdrawing recognition from the Union and by thereafter unilaterally implementing changes in wages, benefits, and other conditions of employment for the bargaining unit employees.

In late February 2008, the ALJ conducted a three-day trial on the consolidated complaint. By the ALJ Decision of May 6, 2008, the ALJ concluded that Narricot had engaged in multiple unfair labor practices, and recommended an Order requiring Narricot to, inter alia, cease and desist from such practices (including its refusal to recognize and bargain with the Union) and to rescind all unilateral changes to unit employees' wages and other conditions of employment. Narricot filed exceptions to the ALJ Decision, and the parties submitted briefs to the Board.

By the Board Decision of January 30, 2009, the Board, acting through a two-member quorum, affirmed, with modifica-

tion, the ALJ Decision, and it adopted, also with modification, the recommended Order. The Board explained that it

> has considered the decision and the record in light of the exceptions and briefs and has decided to affirm the judge's rulings, findings, and conclusions, as modified herein, and to adopt the recommended Order as modified. As discussed below, we agree with the judge that [Narricot] violated Section 8(a)(5) of the Act by withdrawing recognition from the Union and that an affirmative bargaining order is the appropriate remedy for this violation.

Board Decision 1 (footnotes omitted). The Board also specifically affirmed the ALJ's ruling that Narricot contravened § 8(a)(1) "by soliciting employees to resign their union membership and to revoke their dues checkoff authorizations." *Id.* at 1 n.4. Narricot subsequently petitioned this Court for review of the Board Decision, and the Board cross-applied for enforcement thereof. We then granted a motion to intervene made by Shirley Mae Lewis and Henry Vaughan (the "Intervenors"), bargaining unit employees who had supported the decertification petition effort. We possess jurisdiction pursuant to § 10(e) and (f) of the Act, 29 U.S.C. § 160(e)-(f).

## II.

### A.

The first question before us is whether the Board Decision was properly issued by a two-member quorum. As explained in the Board Decision,

> [e]ffective midnight December 28, 2007, Members Liebman, Schaumber, Kirsanow, and Walsh delegated to Members Liebman, Schaumber, and Kirsanow, as a three-member group, all of the Board's powers in anticipation of the expiration of the terms

of Members Kirsanow and Walsh on December 31, 2007. Pursuant to this delegation, Chairman Liebman and Member Schaumber constitute a quorum of the three-member group. As a quorum, they have the authority to issue decisions and orders in unfair labor practice and representation cases. *See* Sec. 3(b) of the Act.

Board Decision 1 n.2.[2] The quorum question is one of statutory interpretation of § 3(b) of the Act, 29 U.S.C. § 153(b). In reviewing an agency's interpretation of a statute, we first determine whether the statute is ambiguous or, instead, whether "Congress has directly spoken to the precise question at issue." *Snell Island SNF LLC v. NLRB*, 568 F.3d 410, 415 (2d Cir. 2009) (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984)). Accordingly, we begin our analysis with the text of the statute.

   Under § 3(a) of the Act, the Board consists of five members, who serve staggered, five-year terms. *See* 29 U.S.C. § 153(a). Section 3(b) provides that

> [t]he Board is authorized to delegate to any group of three or more members any or all of the powers which it may itself exercise. . . . A vacancy in the Board shall not impair the right of the remaining members to exercise all of the powers of the Board, and three members of the Board shall, at all times, constitute a quorum of the Board, except that two members shall constitute a quorum of any group designated pursuant to the first sentence hereof.

*Id.* § 153(b). Thus, § 3(b) contains three provisions that are pertinent here: (1) a "delegation" provision, allowing the

---

[2]Since January 1, 2008, the same two-member quorum has issued more than 400 decisions, as well as numerous unpublished orders, in unfair labor practice and representation cases.

Board to delegate "any or all" of its powers to a three-member group; (2) a "vacancy" provision, providing that a vacancy in the Board "shall not impair" the authority of the remaining Board members to act; and (3) a "quorum" provision, providing that three members constitute a quorum of the Board, but with an exception providing that two Board members constitute a quorum of any group designated pursuant to the "delegation" provision.

In this case, four members of the Board delegated all of the Board's authority, consistent with § 3(b)'s "delegation" provision, to a three-member group in December 2007. When the term of one of those three members expired, the remaining two members constituted a quorum of the three-member group, empowered to act with all of the Board's powers in light of the "vacancy" and "quorum" provisions. Under the plain and unambiguous text of § 3(b), therefore, the designated three-member group was empowered to act with a two-member quorum. Two of our sister courts of appeals have recently reached the same conclusion, as did the Department of Justice's Office of Legal Counsel in a written opinion on which the Board relied. *See New Process Steel, L.P. v. NLRB*, 564 F.3d 840, 846 (7th Cir. 2009) ("The plain meaning of the statute . . . supports the NLRB's delegation procedure."); *Ne. Land Servs., Ltd. v. NLRB*, 560 F.3d 36, 41 (1st Cir. 2009); Quorum Requirements, Memorandum from M. Edward Whelan III, Principal Deputy Assistant Attorney Gen., Office of Legal Counsel (Mar. 4, 2003), *available at* 2003 WL 24166831.

The D.C. Circuit has reached a contrary conclusion, reading § 3(b) as creating distinct quorum requirements for the Board and designated three-member groups. *See Laurel Baye Healthcare of Lake Lanier, Inc. v. NLRB*, 564 F.3d 469, 472-73 (D.C. Cir. 2009). That court thus concluded that the phrase "except that" is "present in the statute only to indicate that the delegee group's ability to act is measured by a different numerical value." *Id.* at 472. In the court's view, the Board

quorum requirement of three members "must be satisfied '*at all times*,'" regardless of whether the Board's authority is delegated to a group of its members. *Id.* (quoting 29 U.S.C. § 153(b)). We disagree with this view, concluding that it is based on an overly narrow construction of the modifying phrase that directly follows the three-member quorum requirement: "*except that* two members shall constitute a quorum of any group designated pursuant to [the delegation provision]." 29 U.S.C. § 153(b) (emphasis added). The statutory phrase "except that" ordinarily introduces an exception. Had Congress desired to write the statute as the D.C. Circuit reads it, it would have simply omitted the words "except that" from § 3(b). The statute would then contain two independent quorum clauses, one applicable to the Board and the other to three-member groups. As it is, however, § 3(b) contains a quorum requirement applicable "at all times," *except* where the Board has delegated its authority to a three-member group. Because the Board made such a delegation in this case, we see the D.C. Circuit's reading of the statute as unpersuasive.[3]

We also reject Narricot's contention that "the 'group of

---

[3]The Second Circuit recently concluded, based on the difference in opinion among the courts of appeals, that § 3(b) "is ambiguous regarding the enduring or residual powers of an NLRB panel once the Board has lost a quorum." *Snell Island*, 568 F.3d at 420. Concluding that neither the canons of statutory construction nor the legislative history resolved the ambiguity, the court applied *Chevron* deference to the Board's interpretation of § 3(b) and determined that it was reasonable. *See id.* at 423-24. Accordingly, the Second Circuit "h[e]ld that the NLRB panel in this case was a lawfully convened panel of three members," which "continued to operate in accordance with section 3(b) of the Act after one of its members ceased to serve on the Board and even though the Board itself lost a quorum." *Id.* at 424. Because we, like the First and Seventh Circuits, conclude that the statute is unambiguous, we need not determine the level of deference that should be accorded to the Board's interpretation of the statute. Finally, we note that the Solicitor General has recently petitioned the Supreme Court for certiorari in the D.C. Circuit's *Laurel Baye* case, and did not oppose the employer's petition for certiorari in the Seventh Circuit's *New Process Steel* case.

three' created by the Board in late December 2007 automatically ceased to exist" — and thus "could not transact business through a purported two-member quorum" — "once Member Kirsanow . . . ceased being a member of the Board itself." Reply Br. of Pet'r 26. Narricot's theory is inconsistent with two provisions of § 3(b). First, Narricot's reading of § 3(b) would turn the two-member quorum provision on its head. If the loss of one member of a three-member group automatically caused the group to cease to exist, then a two-member quorum would *never* suffice. The statute, however, expressly provides for a three-member designated group to act with only two members. *See Photo-Sonics, Inc. v. NLRB*, 678 F.2d 121, 122-23 (9th Cir. 1982) (deeming decision by two-member quorum to be binding where one member of three-member group resigned on day of Board decision). Moreover, Narricot's theory is entirely inconsistent with § 3(b)'s "vacancy" provision, which specifies that a "vacancy in the Board" — or, necessarily, a three-member group acting with the full powers of the Board — "shall not impair the right of the remaining members to exercise all of the powers of the Board." 29 U.S.C. § 153(b). In sum, we are satisfied that, in the underlying proceedings, the remaining two members of the three-member group designated by the Board were empowered to act with the full powers of the Board.

### B.

The second question before us is whether the Board Decision should be enforced on the merits. Importantly, "[t]he function of striking [a] balance [between the conflicting interests of employers and employees] to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the [Board], subject to limited judicial review." *NLRB v. Truck Drivers Local Union No. 449*, 353 U.S. 87, 96 (1957). In enforcement proceedings such as this, we are always obliged to defer to the Board "where it has chosen 'between two fairly conflicting views, even [if we] would justifiably have made a different choice

had the matter been before [us] de novo.'" *Smithfield Packing Co. v. NLRB*, 510 F.3d 507, 515 (4th Cir. 2007) (quoting *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951)). We have recognized that the Board's legal rulings are entitled to deference when they are "rational and consistent" with the Act and the Board's own precedent. *NLRB v. Air Contact Transp., Inc.*, 403 F.3d 206, 210 (4th Cir. 2005). Finally, we treat the "[f]indings of fact made by an ALJ and affirmed by the Board [as] conclusive, so long as they are 'supported by substantial evidence on the record considered as a whole.'" *Anheuser-Busch, Inc. v. NLRB*, 338 F.3d 267, 273-74 (4th Cir. 2003) (quoting 29 U.S.C. § 160(e)). And we have characterized "substantial evidence" as relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *See NLRB v. Peninsula Gen. Hosp. Med. Ctr.*, 36 F.3d 1262, 1269 (4th Cir. 1994).

Narricot's petition for review and the Board's cross-application for enforcement present four issues: (1) whether the Board properly concluded that Narricot provided unlawful assistance to the decertification effort; (2) whether the Board adequately analyzed the causal connection between Narricot's unlawful assistance and its withdrawal of Union recognition; (3) whether the Board rightly determined that Narricot improperly solicited employees to resign from the Union; and (4) whether the remedy ordered by the Board was proper. We assess these issues in turn.

1.

First, the Board determined that Narricot's withdrawal of recognition from the Union contravened § 8(a)(5) of the Act because Narricot had engaged in unfair labor practices prohibited by § 8(a)(1).[4] As the Board recognized in these proceed-

---

[4]It is an unfair labor practice under § 8(a)(1) of the Act for an employer "to interfere with, restrain, or coerce employees in the exercise" of their rights to organize and collectively bargain, and, under § 8(a)(5), for an employer "to refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(1), (5).

ings, an employer can justify its withdrawal of recognition from an incumbent union if it proves "'by a preponderance of the evidence that the union had, in fact, lost majority support at the time the employer withdrew recognition.'" Board Decision 1 (quoting *Levitz Furniture Co.*, 333 N.L.R.B. 717, 725 (2001)). "Here," the Board observed, Narricot "relied solely on the decertification petition as objective proof of the Union's actual loss of majority support." *Id.* However, "when an employer engages in conduct designed to undermine support for the union and to impermissibly assist a decertification effort," the decertification petition is considered "tainted and will not provide the employer with a basis for withdrawing recognition." *Id.* (citing *SFO Good-Nite Inn, LLC*, 352 N.L.R.B. 268, 270-71 (2008)).

As the Board characterized the ALJ Decision, "[t]he judge found that [Narricot] provided unlawful assistance to the decertification effort in violation of Section 8(a)(1) of the Act," which "tainted the petition, invalidating it as evidence of the Union's loss of majority." Board Decision 1. The ALJ therefore "concluded that [Narricot] violated Section 8(a)(5) of the Act by withdrawing recognition based on the unlawfully tainted petition." *Id.* The Board agreed "with this conclusion based on the following evidence of unlawful assistance in the petition effort." *Id.*

> As detailed by the judge, both Human Resource Manager Kris Potter and Supervisor Eric Hayes actively participated in the decertification process. After employee Henry Vaughan asked for information about how to oust the Union, Potter prepared a decertification petition, gave it to Vaughan, and told him that about 220 signatures were needed. Potter also gave copies of the petition to employee Shirley Lewis and to intern Anja Baumann, directing them to return the signed petitions to him. In addition, after giving Baumann a list of unit employees, Potter told her that about 200 signatures were needed on

the petition. At the end of each day that she solicited signatures, Baumann returned copies of the petition to Potter pursuant to his instructions. According to Baumann, Potter would express approval and tell her that he needed more signatures. Finally, Supervisor Hayes told employee Willie Mitchell that employees would receive a pay raise if the Union were decertified and that Mitchell could sign a copy of the petition on the desk in Hayes' office.

*Id.* at 1-2 (footnotes omitted). According to the Board, "[t]his conduct is sufficient proof that [Narricot] officials provided more than the permissible 'ministerial aid' in the initiation and circulation of the decertification petition." *Id.* at 2 (footnote omitted).

In these circumstances, the Board found it unnecessary to reach certain additional findings made by the ALJ. The Board, for example, found no need to rely on the ALJ's finding that misspellings on the decertification petition indicated that Narricot had attempted to disguise its role in the decertification effort, or to assess the ALJ's finding that Baumann was acting as Narricot's agent in the decertification effort. *See* Board Decision 1 n.6, 2 n.9. Additionally, the Board specifically rejected certain findings made by the ALJ, including that Potter made unlawful wage- and benefit-related promises to Baumann and that supervisor Tim Beals unlawfully failed to remove a copy of the petition from the employee break room. Aside from these specific modifications, however, the Board adopted the remainder of the ALJ findings. *See id.* at 1 (specifying that the Board "decided to affirm the [ALJ's] rulings, findings, and conclusions, as modified herein, and to adopt the recommended Order as modified") (footnote omitted)).

Narricot's challenge to the Board Decision is predicated, in part, on its contention that the ALJ findings adopted by the Board are insufficient to establish that Narricot went beyond providing "ministerial aid" to the decertification effort. *See E.*

*States Optical Co.*, 275 N.L.R.B. 371, 372 (1985) ("[W]hile an employer does not violate the Act by rendering what has been termed 'ministerial aid,' its actions must occur in a situational context free of coercive conduct." (footnote and internal quotation marks omitted)).[5] Whether conduct constitutes more than "ministerial aid" turns on whether "the preparation, circulation, and signing of the petition constituted the free and uncoerced act of the employees concerned." *Mickey's Linen & Towel Supply, Inc.*, 349 N.L.R.B. 790, 791 (2007) (internal quotation marks omitted). Whether the employer's conduct was actually coercive, however, is immaterial, provided that the particular conduct would have a "reasonable tendency in the totality of the circumstances to intimidate." *NLRB v. Transpersonnel, Inc.*, 349 F.3d 175, 180 (4th Cir. 2003) (internal quotation marks omitted). And whether "particular conduct tends to coerce or intimidate is a question essentially left to the specialized experience of the Board, and we must show respect for the Board's findings." *Id.*

We cannot say, in light of the record as a whole, that the Board lacked substantial evidence to find that Narricot's con-

---

[5]Narricot and the Intervenors also base their challenge to the Board Decision on the broader contention that the Board's "ministerial aid" standard is too restrictive. They argue that some conduct that rises above the level of "ministerial aid" may not constitute an unfair labor practice, and that any contrary interpretation would trample on the employer free speech rights that are codified in § 8(c) of the Act, 29 U.S.C. § 158(c), and which the Supreme Court recently discussed in *Chamber of Commerce v. Brown*, 128 S. Ct. 2408, 2413-18 (2008). We are not positioned nor inclined to take such a broad stride across several decades of settled precedent prohibiting employers from becoming overly entangled with union decertification drives. First, the Board's legal determinations are entitled to deference, and are reviewed by this Court only to ensure that they are "rational and consistent" with the Act. *See Anheuser-Busch, Inc. v. NLRB*, 338 F.3d 267, 273 (4th Cir. 2003). Second, Narricot and the Intervenors substantially understate the role of the proviso in § 8(c) explaining that employer speech is protected only so long as it is noncoercive, i.e., lacking any "threat of reprisal or force or promise of benefit." 29 U.S.C. § 158(c); *see Brown*, 128 S. Ct. at 2413.

duct in this case crossed the line beyond mere ministerial assistance. Narricot contends that both this Court and the Board have recognized that "[m]erely providing accurate information upon request of the employee, even for sample language, does not constitute conduct that would tend to coerce or intimidate." *Transpersonnel*, 349 F.3d at 184; *see Bridgestone/Firestone, Inc.*, 337 N.L.R.B. 133 (2001) (deciding that employer's drafting of decertification petition constituted lawful ministerial aid).

The Board Decision, however, reflects that it adopted findings by the ALJ that Narricot engaged in conduct extending beyond mere ministerial aid. For example, the Board adopted the ALJ's finding that "both Human Resource Manager Kris Potter and Supervisor Eric Hayes actively participated in the decertification process." Board Decision 1. More specifically, "[a]fter employee Henry Vaughn asked for information about how to oust the Union, Potter prepared a decertification petition, gave it to Vaughn, and told him that about 220 signatures were needed." *Id.* (footnote omitted). The Board also found that Potter "gave copies of the petition to employee Shirley Lewis and to intern Anja Baumann, directing them to return the signed petitions to him." *Id.* And, without being asked to do so, Potter gave Baumann a list of unit employees, and told her that about 200 signatures were needed on the petition. At the end of each day that Baumann solicited signatures, she returned copies of the petition to Potter pursuant to his instructions, at which point Potter expressed his approval and told Baumann that more signatures were needed. In addition, the Board observed that "Supervisor Hayes told employee Willie Mitchell that employees would receive a pay raise if the Union were decertified and that Mitchell could sign a copy of the petition on the desk in Hayes' office." *Id.* at 2.[6]

---

[6]Narricot urges us to discredit this finding because, contrary to the ALJ's credibility determination, Mitchell was not credible. The Board

Moreover, the ALJ's findings of fact — which were appended to the Board Decision and expressly affirmed by the Board unless specifically modified, *see* Board Decision 1 — provide other specific details of Potter's conduct. For instance, after Baumann signed the petition, Vaughan suggested that Baumann speak with Potter if she were interested in helping collect signatures. Baumann then met with Potter, advised him she had just signed the petition, and told him that she was interested in learning about what she had signed. (Baumann was from Germany and did not understand how unions function in the United States.) Potter responded that there was a union at the facility and that it cost Narricot money, he gave Baumann a blank copy of the petition and a list of employee names, and he told Baumann that the CBA was expiring in October and about 200 signatures were needed on the petition. Baumann then solicited employee signatures before, during, and after her work hours, and was paid overtime for time spent doing so. When one employee asked Baumann how the employee could remove her signature from the petition, Baumann advised the employee that she would have to talk with Potter because he had the petitions. *See* Board Decision 6-7.

The Board relied on this cumulative evidence in ruling that Narricot's conduct exceeded mere ministerial aid. *See* Board Decision 2 n.7 ("Member Schaumber does not pass on whether the mere provision of an employee list to facilitate the collection of signatures on a decertification petition would constitute unlawful assistance. He finds the violation based on the cumulative evidence cited above."). Given that the Board's ruling was predicated on the combined effect of Nar-

refused to disturb the ALJ's credibility determination and to credit Hayes's testimony over Mitchell's, *see* Board Decision 1 n.3, and we are constrained to do the same, *see WXGI, Inc. v. NLRB*, 243 F.3d 833, 842 (4th Cir. 2001) (recognizing that this Court will not disturb Board's credibility findings absent "extraordinary circumstances").

ricot's conduct, we are obliged to examine the record as a whole. Viewed in that context, the Board Decision is supported by substantial evidence, and it is rational and consistent with the Act and the Board's own precedent.

2.

Second, the Board concluded that, because the objective value of the decertification petition was tainted by Narricot's unlawful participation therein, it was "unnecessary to pass on whether the petition was tainted under the standards set forth in *Master Slack Corp.*, 271 N.L.R.B. 78, 84 (1984)." Board Decision 1 n.5 (citing *SFO Good-Nite Inn*, 352 N.L.R.B. at 271 n.11). In *Master Slack*, the Board recognized that an employer cannot rely on a decertification petition if there is a showing that *prior*, unremedied unfair labor practices caused or had a meaningful impact on employee disaffection. *See* 271 N.L.R.B. at 84. "In short, there must be a causal relationship between the unlawful conduct and the [decertification] petition . . . ." *Id.* (outlining four factors for determining causation).

Narricot contends that the Board adopted an "entirely new standard" for this case when it ignored its "longstanding requirement of a causal connection" between the unfair labor practices committed by the employer and the union decertification effort. Br. of Pet'r 28. The Board asserts, however, that it was not, in these circumstances, required to analyze causation under *Master Slack*, because that decision only applies "to cases that do not primarily involve the employer's direct assistance or participation in the decertification effort." Br. of Respondent 58-59 (citing cases).

In *Master Slack*, the Board established a rule intended to ensure a causal link between decertification efforts and *other* unfair labor practices distinct from any unlawful assistance by the employer in the actual decertification petition. *Compare SFO Good-Nite Inn*, 352 N.L.R.B. at 271 n. 11 (bypassing

causation analysis where employer engaged in unlawful conduct connected with decertification effort), *with NLRB v. Williams Enters.*, 50 F.3d 1280, 1288 (4th Cir. 1995) (applying *Master Slack* causation test to determine if decertification decision was tainted by "antecedent unlawful conduct"). Thus, where, as here, the unfair labor practices identified by the Board are directly related to the decertification effort, the Board need not make a specific causation finding under the four-factor *Master Slack* test. *See Glasser v. Heartland-Univ. of Livonia, Mich., LLC*, 632 F. Supp. 2d 659, 671 (E.D. Mich. 2009) (explaining Board's precedent that *SFO Good-Nite Inn* "stands independent from *Master Slack*" and its causation test). Again, we must uphold the Board's legal rulings when they are rational and consistent with the Act. Put simply, Narricot has not demonstrated that the Board's analysis failed to satisfy that deferential standard. Thus, the Board did not err in analyzing the connection between Narricot's unfair labor practices and the decertification petition underlying its withdrawal of recognition from the Union.[7]

3.

Third, the Board also affirmed the ALJ's ruling that Narricot contravened § 8(a)(1) when it solicited employees to resign their Union memberships and to revoke their dues checkoff authorizations. *See* Board Decision 1 n.4. Narricot's actions were prompted by inquiries from several employees as to how they could revoke their Union membership. In addition to preparing revocation letters for those employees, Narricot also presented the letters to the employees in such a way

---

[7]Narricot also suggests that the Board erred in conducting its causation analysis under *Master Slack* because it ignored evidence that, according to Narricot, proves that employees were dissatisfied with the Union before the decertification petition was circulated. Because the Board did not err in not applying the *Master Slack* causation test, this contention lacks merit. Moreover, the Board observed that it "has not found that this type of evidence, even if considered collectively, would be sufficient as objective proof of a union's loss of majority support." Board Decision 2.

that would have tended to make them feel coerced to sign, and then mailed the letters to the Union by certified mail at its own expense. *See id.* at 10-11. Thus, the Board concluded that Narricot's conduct in this regard "went well beyond" "merely preparing [revocation] letters" for the employees to sign. Board Decision 1 n.4.[8] Narricot primarily contends that the membership resignations were initiated by the employees, and that none of the employees were actually coerced into resigning their union membership. Once again, however, the relevant inquiry is not actual coercion, but whether the employer's conduct would have had a reasonable tendency to intimidate in light of the totality of the circumstances. *See Transpersonnel*, 349 F.3d at 184. Given the Board's finding that Narricot's conduct would have tended to coerce the employees to sign the resignation letters, we have no basis for disturbing the Board Decision on this issue.

4.

Finally, the Board deemed an affirmative bargaining order — with an implicit bar on further decertification efforts for a reasonable period of time — to be the appropriate remedy. Narricot asserts, however, that the Board's order, "with its double-edged sword of a decertification bar, trounces upon [employees'] § 7 rights and forces employees to be represented by the Carpenters Union for a reasonable period of time — even if the employees no longer want to be represented by the Carpenters Union." Br. of Pet'r 50. We have previously recognized, however, that the Board possesses "broad discretion to choose a remedy." *Williams Enters.*, 50 F.3d at 1289. Thus, "[w]e must enforce its choice unless it can

---

[8]The Board declined to reach the issue of whether merely preparing such revocation letters constitutes unlawful assistance, *see* Board Decision at 1 n.4 ("Member Schaumber does not pass on whether merely preparing letters revoking dues-deduction authorization on behalf of employees would be unlawful."), observing that Narricot "went well beyond such assistance." *Id.*

be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the [Act]." *Id.* (internal quotation marks omitted). We have also recognized that an affirmative bargaining order is often a necessary component of the Board's chosen remedy if the parties are to be returned to the status quo ante. *See id.* at 1289-90.

In these proceedings, the Board observed that the D.C. Circuit "has required the Board to justify, on the facts of each case, the imposition of an affirmative bargaining order." Board Decision 2. The D.C. Circuit has required an affirmative bargaining order to be justified by a reasoned analysis and balancing of three factors: (1) the employees' § 7 rights; (2) whether other purposes of the Act override the rights of employees to choose their bargaining representatives; and (3) whether alternative remedies are adequate to remedy the violations of the Act. *See Vincent Indus. Plastics, Inc. v. NLRB*, 209 F.3d 727, 738 (D.C. Cir. 2000).

With respect to the first *Vincent Industrial* factor, the Board explained that Narricot

> committed unfair labor practices both before and after its unlawful withdrawal of recognition that manifested its disregard for employees' Section 7 rights. Prior to the withdrawal of recognition, [Narricot] solicited employees to withdraw from union membership and to revoke their dues checkoff, it provided unlawful assistance in the initiation and circulation of the decertification petition, and it promised a wage increase if the Union were decertified. After [Narricot] withdrew recognition, it followed through on the unlawful promise by making unilateral changes in wages, the employees' 401(k) plan, their health and welfare plans, and holidays. Under these circumstances, it is only by restoring the status quo ante and requiring [Narricot] to bargain with the

Union for a reasonable period of time that employees' Section 7 right to union representation can be vindicated. This will give employees an opportunity to fairly assess the Union's effectiveness as a bargaining representative and determine whether continued representation by the Union is in their best interests.

Board Decision 3. In assessing the second *Vincent Industrial* factor, the Board observed that an affirmative bargaining order would serve the Act's purposes "of fostering meaningful collective bargaining and industrial peace," by removing Narricot's "incentive to delay bargaining or to engage in any other conduct designed to further discourage support for the Union," "ensur[ing] that the Union will not be pressured, by the possibility of a decertification petition, to achieve immediate results at the bargaining table," and "reinstating the Union to its rightful position as the bargaining representative chosen by a majority of the employees." *Id.* Lastly, in considering the third factor, the Board observed that the only alternative remedy — a cease-and-desist order alone, without a temporary decertification bar — would be inadequate, "because it would allow another challenge to the Union's majority status before the employees had a reasonable time to regroup and bargain with [Narricot] through their chosen representative in an effort to reach a [CBA]," and because it "might very well allow [Narricot] to profit from its own unlawful conduct." *Id.* On balance, the Board concluded "that these circumstances outweigh the temporary impact the affirmative bargaining order will have on the rights of employees who oppose continued union representation." *Id.*

In view of the Board's careful justification for its affirmative bargaining order, the deference we are obliged to accord the Board's chosen remedy, and our prior approval of the specific remedy employed here, we are constrained to reject Narricot's petition and leave the order undisturbed.

### III.

Pursuant to the foregoing, we deny Narricot's petition for review and grant the Board's cross-application for enforcement.

*PETITION FOR REVIEW DENIED AND*
*CROSS-APPLICATION FOR ENFORCEMENT GRANTED*